## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRASON LEE, Derivatively On Behalf Of THE CHEMOURS COMPANY,<br><br>           Plaintiff,<br><br>     v.<br><br>RICHARD H. BROWN, MARK P. VERGNANO, BRADLEY J. BELL, CURTIS V. ANASTASIO, MARY B. CRANSTON CURTIS J. CRAWFORD, DAWN L. FARRELL, SEAN D. KEOHANE, and ERIN N. KANE,<br><br>           Defendants,<br><br>THE CHEMOURS COMPANY,<br><br>           Nominal Defendant. | Case No.:<br><br><br><br>__JURY TRIAL DEMANDED__ |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff  Brason Lee ("Plaintiff"), derivatively and on behalf of The Chemours Company ("Chemours" or the "Company"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chemours, Company press releases and conference call transcripts, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

discovery.

## I.      NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Chemours against certain of its officers and directors seeking to remedy Defendants' (defined below) breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") that caused substantial harm to the Company.

2.      This derivative action arises from several misrepresentations to the market by Defendants (defined below) that mischaracterized the Company's true financial condition and understated the Company's liabilities from decades of environmental pollution.  Defendants admitted the falsity of their statements in a lawsuit filed by the Company against E.I. du Pont de Nemours and Company ("DuPont"), the Company's former parent.  In the Company's sworn pleading, Defendants admit that these undisclosed liabilities rendered the Company insolvent (as a matter of law) for its entire history as a standalone public Company.  As Defendants admit the Company was insolvent from "day one" following its spin-off from DuPont.

3.      DuPont's Performance Chemicals division, the predecessor to Chemours, had a long history of discharging perfluoroalkyl and polyfluoroalkyl substances ("PFAS")—durable chemical compounds found in numerous common household products—into groundwater supplies near its plants.  PFAS are highly toxic substances known as "forever chemicals" because they build up in the blood of those who ingest contaminated water or air.  Even though DuPont (and Chemours) had known about the harms of PFAS since at least the 1950s, the general public found out only recently, as a result of mounting litigation against DuPont that unearthed DuPont's own internal studies documenting links between PFAS exposure and serious health conditions, which

included deadly cancers.

4.      In the face of these environmental liabilities, DuPont devised a plan to rid itself of them: it would spin off the liabilities into another company that would become Chemours. Following the spin-off on July 1, 2015, the Company assumed two-thirds of DuPont's environmental liabilities and 90% of DuPont's pending environmental litigation.  As a result of the volume of the liabilities it took on, the Company experienced difficulty, which caused its stock price to plummet from a target price of $21 per share to just over $3 per share months after the spinoff (an 85% decline).  As a result of the Company's liabilities and toxic assets, the market speculated after the spinoff that the Company would fail.  In an attempt to refute this speculation, Defendants embarked on a campaign to falsely assure the market that these liabilities were limited and fully under control.

5.      As a result, Defendants implemented a "Five-Point Transformation Plan."  The objective was to transform the Company's balance sheet because, as Defendant Mark. P. Vergnano ("Vergnano") (the Company's President and Chief Executive Officer ("CEO")) admitted: "investors were worried if we were going to be solvent—were we going to make it through this or not."  Further, Defendants misrepresented the risks that the Company's inherited liabilities posed for the Company.  On the Company's very first earnings call, Defendant Mark E. Newman ("Newman") (the Company's Senior Vice President ("SVP") and Chief Operating Officer ("COO")) assured the market that the Company's executive leadership, which consisted of long-time DuPont veterans, had been "monitoring these liabilities for many years," and that it was "important" for the market/investors to know that those liabilities were "well understood and well managed."  In SEC filings, Defendants provided more reassurance by not only quantifying the Company's environmental liabilities through accruals (a customary accounting practice that

quantifies probable and estimable liabilities), but also disclosing that "potential liabilities may range up to" certain specified and regularly updated maximum amounts above the accruals.

6.     Beginning with the Company's 2016 Form 10-K filed on February 17, 2017 ("2016 Form 10-K")—and in each of the Company's quarterly and annual reports filed after that—the Company added language that it had never used before with respect to its disclosed maximum liability ranges, stating that there was only a "remote" chance that the Company's liabilities would exceed its accruals "up to" those specified maximum amounts. Defendants also praised the purported success of their "transformation plan," stating that the Company in "no way" had been "set up to fail," and praised the Company's "strong" and "de-risked" balance sheet that sparked a "turnaround" that was "nothing short of remarkable."

7.     The market relied on Defendants' statements, including the Company's purported maximum liability caps.  After these representations were made, analysts concluded that the Company had "healed tremendously from its spin-out of DuPont," reporting that the Company had "reduced its risk portfolio" and "reduced litigation risk" because its "balance sheet [and] liabilities [were] cleaned up."  As a result, the Company's stock price increased to over $58 per share on October 24, 2017.

8.     Defendants admitted in a sworn pleading that all of these statements were false.  In a complaint signed and verified by Defendant Newman, and originally filed under seal in Delaware Chancery Court on May 13, 2019 (the "Verified Complaint")[1], the Company stated that prior to the spinoff, DuPont engaged in a "sham" process of deliberately certifying "systematically and spectacularly wrong" maximum estimates for each of the Company's inherited liabilities in order to claim that it was complying with Delaware law, which required that spun off companies be

---

[1]     Defendants repeated their admissions in the Amended Verified Complaint filed on August 14, 2019.

viable and solvent.  In fact, the previously undisclosed liabilities were so "huge," "radical and extraordinary," and "staggering"—and, rather than "remote," virtually inevitable—that the Company admitted "in no uncertain terms" that, "as of the date of the spin, the Company was insolvent" in violation of Delaware law.

9.     As the Company's own former parent stated: "Chemours has been telling a strikingly different story to the SEC and the investing public [in which] Chemours regularly promotes itself as a spin-off success."  The Verified Complaint identified approximately $2.5 billion in imminent environmental liabilities—a huge amount that was eight times the Company's $313 million in accruals during the time in issue; dwarfed the maximum liability amounts that Defendants asserted were only "remotely" possible, which averaged less than $500 million; and significantly exceeded its available cash of $700 million, net assets of $816 million, and even its market capitalization of $2.4 billion in approximately August of 2019.  The Company's actual liability exposure could be multiples greater, as the Company's counsel admitted that the $2.5 billion figure was "nowhere near the maximum," and respected financial analysts have stated that the Company's ultimate financial exposure could reach as high as $5.5 to $6 billion.

10.     By Defendants' admissions, they knew from the Company's inception that DuPont's estimated maximums for the inherited liabilities were "baseless concoction[s]," and that these liabilities were so huge that they rendered the Company legally "insolvent."  These liabilities were so bad that, prior to the spinoff, Defendant Newman sent an email to DuPont management pleading for an additional $300 million in reserves just "to function on day one."  DuPont refused his plea.

11.     Defendants' fraud was exposed in multiple disclosures that revealed Defendants' fraud and the Company's true financial condition.  For instance, in early May 2019, an analyst

presented research demonstrating that the Company's true liabilities were greater than what it had disclosed, resulting in a 15% drop in the Company's stock price. The Company denied the assertion and claimed that it was adequately reserved for any potential liabilities.

12.    However, the Company filed its lawsuit against DuPont under seal in which it admitted that its liabilities were so large that they rendered the Company insolvent. When the lawsuit was unsealed in late June, the Company's stock price dropped another 15%, and analysts reported that the Company had now "quantified potential high-end liabilities of approximately $2.5 billion" that were "materially higher than expected."

13.    Then, on August 1, 2019, the Company reported a significant increase in PFAS litigation with a substantial reduction in free cash flow guidance, and the stock dropped another 19% to close at $14.69 per share on August 2, 2019. In short, these disclosures wiped out $2 billion of the Company's market capitalization.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Sections 10(b) and 20(a) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### A.      Plaintiff

16.     ***Plaintiff Brason Lee*** ("Plaintiff Lee") has been a stockholder of the Company during the events in issue and remains a current stockholder of the Company.  He intends to retain ownership of stock through the prosecution of the instant matter.

### B.      Nominal Defendant

17.     Nominal Defendant Chemours is a Delaware corporation headquartered in Wilmington, Delaware.  Chemours was formerly the Performance Chemicals business of DuPont and began trading as a public company after its spin-off in July 2015.

### C.      Director Defendants

18.     ***Defendant Richard H. Brown*** ("Brown") is the Company's Chairman of the Board of Directors ("Board") and has been since 2015.

19.     ***Defendant Mark P. Vergnano*** ("Vergnano") is the Company's President and CEO and a member of the Board.  Defendant Vergnano has been the Company's President and CEO since the Company's inception in July 2015.  Prior to that, Vergnano was Executive Vice President of Performance Chemicals at the Company's former parent company, DuPont, since October 2009. During the relevant period, Defendant Vergnano made materially false and misleading statements and omissions during earnings calls, investor conferences, public speeches, and televised interviews.  Defendant Vergnano also reviewed, approved, signed and certified the Company's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on February 17, 2017, May 3, 2017, August 3, 2017, November 3, 2017, February 16, 2018, May 4, 2018, August 3, 2018, November 2, 2018, February 15, 2019, and May 3, 2019, which contained materially false and misleading statements and omissions.

20.     ***Defendant Bradley J. Bell*** ("Bell") has been a Director since 2015.  Defendant Bell

is also the Chair of the Audit Committee, and a member of the Compensation and Leadership Development Committee.

21.     **Defendant Curtis V. Anastasio** ("Anastasio") has been a Director since 2015. Defendant Anastasio is a member of the Audit Committee and Nominating and Corporate Governance Committee.

22.     **Defendant Mary B. Cranston** ("Cranston") has been Director since 2015. Defendant Cranston is a member of the Audit Committee and the Chair of the Nominating and Corporate Governance Committee.

23.     **Defendant Curtis J. Crawford** ("Crawford") has been a Director since 2015. Defendant Crawford is a member of the Audit Committee and the Chair of the Compensation and Leadership Development Committee.

24.     **Defendant Dawn L. Farrell** ("Farrell") has been a Director since 2015.  Defendant Farrell is a member of the Compensation and Leadership Development Committee and Nominating and Corporate Governance Committee.

25.     **Defendant Sean D. Keohane** ("Keohane") has been a Director since 2018. Defendant Keohane is a member of the Compensation and Leadership Development Committee and Nominating and Corporate Governance Committee.

26.     **Defendant Erin N. Kane** ("Kane") has been a Director since 2019.   Defendant Kane is a member of the Audit Committee and the Compensation and Leadership Development Committee.

27.     Defendants Brown, Vergnano, Bell, Anastasio, Cranston, Crawford, Farrell, Keohane and Kane are collectively hereinafter referred to as the "Director Defendants."

28.     Defendants Bell, Anastasio, Cranston, Crawford, and Kane are collectively referred

to as the "Audit Committee Defendants."

29.     The Directors Defendants breached their duties to the Company by making or causing the Company to make false statements that artificially inflated the price of the Company securities.  The Director Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

### D.     Officer Defendant

30.     ***Defendant Mark E. Newman*** ("Newman") is the Company's SVP and COO as of June 2019, before which Defendant Newman served as SVP and Chief Financial Officer ("CFO") starting in 2014 when he joined the Company.  During the relevant period, Defendant Newman made materially false and misleading statements and omissions during earnings calls and investor conferences.  Defendant Newman also reviewed, approved, signed and certified the Company's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on February 17, 2017, May 3, 2017, August 3, 2017, November 3, 2017, February 16, 2018, May 4, 2018, August 3, 2018, November 2, 2018, February 15, 2019, and May 3, 2019, which contained materially false and misleading statements and omissions.

31.     The Director Defendants and Defendant Newman are herein referred to as the "Defendants."

### THE AUDIT COMMITTEE CHARTER

32.     The Audit Committee Charter states in relevant part:

The Audit Committee (the "Committee") is appointed by the Board of Directors (the "Board") of The Chemours Company (the "Company") to assist the Board in the oversight of (i) the integrity of the financial statements of the Company, (ii) the qualifications and independence of the Company's independent auditor, (iii) the

performance of the Company's internal audit function and independent auditors (iv) the compliance by the Company with legal and regulatory requirements. The Committee shall also prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

**Committee Duties and Responsibilities**

In carrying out its responsibilities, the Committee shall:

A.    <u>**General Duties**</u>

1.    Review, at least annually, the Committee's charter and recommend any proposed changes to the Nominating and Corporate Governance Committee.
2.    Regularly report on its deliberations and actions to the Board and make recommendations to the Board, as appropriate, in accordance with the duties specified in this Charter and pursuant to applicable regulatory requirements and the listing standards of the New York Stock Exchange.
3.    Conduct, and report to the Board the results of, an annual performance evaluation of the Committee, which evaluation shall compare the performance of the Committee with the requirements of this Charter.
4.    In addition to the activities enumerated herein, perform any other activities consistent with this Charter, the Company's Amended and Restated Bylaws and governing law, as the Committee or the Board deems necessary or appropriate or as required by law or regulations.

\*    \*    \*

E.    <u>**The Company's Financial Statements**</u>

1.    Discuss the quarterly and annual financial statements and related footnotes of the Company and its subsidiaries with management and the independent auditor, as well as the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
2.    In connection with the preparation of quarterly and annual financial statements of the Company and its subsidiaries and otherwise as is necessary, review, or as appropriate the Chair on behalf of the Committee shall review, with the independent auditor and management on a timely basis any matters appropriate or required to be discussed by applicable accounting and auditing professional standards or applicable regulations. These discussions shall include, as appropriate, any significant financial reporting issues; judgments about the quality and acceptability of accounting principles as applied to the Company's financial reporting, including the receipt from the independent auditor of a report on alternative treatments of financial information within generally accepted accounting principles discussed with management, the ramifications of such

alternatives, and the treatment preferred by the independent auditor; the reasonableness of significant judgments made in connection with the preparation of the Company's financial statements and the clarity of the disclosures therein and any analyses prepared by management or the independent auditor with respect thereto; the effect of regulatory and accounting initiatives and off-balance sheet structures on the Company's financial statements; and the adequacy of the Company's internal controls and the internal auditor's response thereto.

3.    Recommend to the Board whether to include the audited financial statements in the Company's Form 10-K.

4.    Discuss generally earnings press releases and the financial information and any earnings guidance provided to the Company's analysts and rating agencies, as well as the disclosure of any "pro forma" or "non-GAAP" information.

5.    Review both the acceptability and quality of major changes to the Company's accounting principles and practices as suggested by the independent auditor, Chief Audit Executive or management, and oversee the resolution of any disagreements between management and the independent auditor regarding financial reporting issues.

6.    Discuss generally with management, the independent auditor and the Chief Audit Executive the selection, application and disclosure of critical accounting policies and estimates used by the Company.

7.    Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, any fraud involving any employees who have a significant role in the Company's internal control over financial reporting, and any significant changes in internal controls over financial reporting or in other factors that could significantly affect internal controls over financial reporting, including any corrective actions with regard to significant deficiencies and material weaknesses.

8.    Review and discuss with the independent auditor its assessment of the effectiveness of the Company's internal controls over financial reporting, whether any changes are necessary in light of such assessment, and the basis for its report on the Company's internal controls.

9.    Review and discuss with management their assessment of the effectiveness of the Company's disclosure controls and procedures and whether any changes are necessary in light of such assessment.

10.    Review with the General Counsel or the attorney(s) designated by the General Counsel any legal matters that may have a material impact on the financial statements.

11.    Oversee the establishment of and monitor procedures for: (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters; and (ii) the confidential, anonymous submission by the employees of the Company of

concerns regarding accounting or auditing matters.

## THE CHEMOURS COMPANY CODE OF ETHICS FOR THE CHIEF EXECUTIVE OFFICER, CHIEF FINANCIAL OFFICER AND CONTROLLER

33.     The Company's Code of Ethics states in relevant part:

**Applicability**

This Code of Ethics applies to the Chief Executive Officer, the Chief Financial Officer, and the Controller and has been adopted by the Audit Committee of the Board of Directors of The Chemours Company (the "Company"), which is authorized to amend this Code.

**Standards of Conduct**

In performing his or her duties, the Chief Executive Officer, the Chief Financial Officer, and the Controller shall

- exhibit and promote honest and ethical behavior within the Company, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships as described in the Company's Code of Conduct;
- promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications made by the Company;
- comply with applicable governmental laws, rules and regulations; and
- report promptly any violation of this Code of Ethics to the Chair of the Audit Committee.

**Accountability/Administration**

The Chief Executive Officer, the Chief Financial Officer, and the Controller are expected to adhere to this Code of Ethics. The Chair of the Audit Committee will assess compliance with this Code of Ethics and report any material violations to the Audit Committee. The Audit Committee will consider such reports and shall recommend to the Board of Directors appropriate responsive actions.

Any request for a waiver under this Code of Ethics shall be submitted in writing to the Chair of the Audit Committee who has authority to grant or deny it. Any amendment to or waiver from this Code of Ethics shall be promptly disclosed on the Company's website or through a current report filled with the Securities and Exchange Commission.

## THE COMPANY'S BOARD OF DIRECTORS

## CORPORATE GOVERNANCE GUIDELINES

34.     The Company's Board of Directors Corporate Governance Guidelines state in relevant part:

**The Board**

**Responsibility**

The Board has an active responsibility for broad corporate policy and overall performance of the Company through oversight of management and stewardship of the Company to enhance the long-term value of the Company for its stockholders and the vitality of the Company for its other stakeholders.

**Role**

In carrying out its responsibility, the Board has specific functions, in addition to the oversight of management in the operation of the Company and the Company's business performance, including providing input and perspective in evaluating alternative strategic initiatives; reviewing and, where appropriate, approving fundamental financial and business strategies and major corporate actions; ensuring processes are in place to maintain the integrity of the Company; overseeing risks that could affect the Company's long-term value; evaluating and compensating the Chief Executive Officer; and planning for Chief Executive Officer succession and monitoring succession planning for other key positions. Directors bring to the Company a wide range of experience, knowledge and judgment, and will use their skills and competencies in the exercise of their duties as directors of the Company. Duties Directors are expected to expend sufficient time, energy and attention to assure diligent performance of their responsibility. Directors are expected to attend meetings of the Board and its Committees on which they serve and the Annual Meeting of Stockholders; review materials distributed in advance of the meetings; and make themselves available for periodic updates and briefings with management via telephone or one-on-one meetings.

**Leadership**

The Company's governing documents allow the roles of Chair and Chief Executive Officer to be filled by the same or different individuals. This approach allows the Board flexibility to determine whether the two roles should be separated or combined based upon the Company's and the Board's assessment of the Company's leadership from time to time. If the Board does not have an independent Chairperson, the Board will appoint a Lead Independent Director and determine the Lead Independent Directors' duties and responsibilities.

## IV.    SUBSTANTIVE ALLEGATIONS

A.   **Overview**

35.   The Company produces industrial and specialty chemicals. The Company is organized into three segments: (1) Fluoroproducts; (2) Chemical Solutions; and (3) Titanium Technologies.  Of these three segments, Fluoroproducts, which manufactures PFAS, accounts for approximately 50% of the Company's profits and revenues.

36.   PFAS are man-made compounds that provide chemical durability, causing them to be used in hundreds of common household products, including non-stick cookware such as Teflon, water repellants such as Scotchgard, and coated papers for fast food.  However, the chemical properties that make PFAS so durable also cause them to not break down in the environment—such that they have been labelled "forever chemicals."  In addition, PFAS "bio-accumulate" in the blood stream of people who ingest contaminated drinking water or breathe contaminated air.

37.   While the harms of PFAS were not known to the public until recently, internal DuPont documents demonstrate that they were known to DuPont and the Company for decades. As Robert Bilott—author of the book *Exposure*, which recounts Mr. Bilott's role as the lawyer representing multiple individuals in West Virginia and Ohio who were harmed by PFAS discharged by DuPont (recently adapted into the movie Dark Waters)—stated during the recent September 10, 2019 Congressional hearing by the House Subcommittee on the Environment on the issue:

> The public may only now be realizing the scope of this problem, but the companies that manufactured these chemicals [*i.e.*, Chemours and DuPont] ***have been aware of the risks for decades but failed to alert the rest of us***.  I know because I spent the last 20 years of my career in litigation with these companies, pulling out of their own internal files what was already there and was already known about the risk of these chemicals.

38.   The "internal files" Mr. Bilott referenced, which were considered by the House Subcommittee, demonstrate that DuPont itself had conducted in depth internal research over the

course of decades into the harmful health effects of PFAS, and in particular perfluorooctanoic acid ("PFOA"), which is among the most prevalent PFAS.

39.     For instance, in the 1950s, DuPont's own scientists documented the health effects of PFAS.  By the 1960s and 1970s, DuPont compiled data in its files from animal studies demonstrating toxic effects on multiple species: rats, dogs, rabbits, monkeys, and multiple types of organ systems.  By the 1970s, DuPont knew that PFAS was building up in the blood of humans and remaining there for extended periods of time.  By the 1980s, DuPont became concerned about liver damage and birth defects among its own PFAS-exposed workers, causing it to remove all female employees from Teflon-related jobs, and conducted internal studies on animals that caused it to label PFOA as a possible human carcinogen.  In the 1990s, DuPont conducted a two-year rat study confirming that PFOA exposure could cause testicular, liver and pancreatic tumors in rats, which a DuPont scientific paper concluded posed the same risk for humans.

40.     As the decades passed, DuPont's Performance Chemical division's discharges of PFAS into the environment began to spark PFAS-related litigation that led to scientific studies linking PFAS exposure to significant and deadly heath issues.  For instance, in 2005, as part of a settlement regarding DuPont's alleged PFOA contamination from its Washington Works site in Parkersburg, West Virginia—one of the litigations spearheaded by Mr. Bilott—DuPont agreed to fund a "medical monitoring" health project aimed at determining the medical harms experienced by the exposed local population.  As part of the settlement, a panel of experts approved by DuPont was established to study the effects of PFOA exposure by examining the blood of approximately 70,000 residents. The "Science Panel" finished its analysis in 2012 and concluded that there were "probable links" between PFOA exposure and six serious diseases: high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer and kidney cancer.  This

led to 3,500 individuals coming forward as having been diagnosed with one of the six diseases due to PFOA exposure from Washington Works, which resulted in a multi-district litigation filed in the Southern District of Ohio against DuPont (which was inherited by the Company upon the spinoff, the "Ohio MDL").

41.    As a result of DuPont's vast internal knowledge of the adverse health consequences of PFOA exposure, DuPont shifted to a different type of PFAS called "GenX" that was purportedly less toxic.  In 2009, DuPont filed the required Toxic Substances Control Act ("TSCA") notices with the U.S. Environmental Protection Agency ("EPA") for two types of GenX compounds. When the EPA reviewed the data, it was concerned that, just like the previously produced PFAS, GenX would "persist in the environment" and "could bio-accumulate, and be toxic . . . to people, wild animals, and birds."

42.    Recognizing its costly and mounting exposure to PFAS-related litigation and environmental remediation expenses, DuPont restructured the company to rid itself of the Performance Chemicals unit and its associated liabilities altogether—***a plan that would result in the formation of Chemours as an independently traded company***.

**B.    The Spin-Off Of Chemours From DuPont**

43.    In 2013, DuPont started "Project Beta," a project aimed at off-loading DuPont's Performance Chemicals business and its substantial associated environmental liabilities. However, DuPont understood that the magnitude of the environmental liabilities meant that an outright sale of the Performance Chemicals division was not financially feasible—no buyer would assume such huge amount of liabilities without a commensurate discount that would defeat the purpose of the transaction altogether.  Thus, DuPont rid itself of its Performance Chemicals division through a spin-off that would become Chemours.

16

44.    On June 5, 2015, DuPont reported that its board of directors had approved the spinoff of Chemours.   The Separation Agreement governing the spin-off granted the Company less than 20% of DuPont's business lines while requiring it to assume significant liabilities, including: (1) $4 billion in debt, with the Company being required to use the proceeds of that debt to authorize a $3.91 billion dividend back to DuPont; (2) 90% of DuPont's pending litigation by volume of cases, including growing PFOA-related litigation; (3) 67% of DuPont's environmental liabilities covering over 80 sites; and (4) liabilities that had nothing to do with the Company's business; for example, the DuPont's benzene liability in connection with the sale of its Performance Coatings business to Carlyle.   Further, the Separation Agreement required the Company to indemnify DuPont against any liability "relating to, arising out of, by reason of or otherwise in connection with" the liabilities that DuPont had assigned to the Company without limitation, and provided that the Company could not seek any recourse from DuPont with respect to any of those liabilities.

45.    As of the date of the spin-off (July 1, 2015), the Company faced significant liabilities.   Shortly after the spin-off, the Company announced that it was slashing its future dividends to almost zero.   Even with this implemented, the Company faced a liquidity crisis that forced the Company to, among other things, lay off 1,000 employees, close plants, sell business lines, and effectuate two corporate restructurings, all of which negatively impacted the Company's stock price.   While DuPont marked the Company's stock price at $21 per share at the time of the spin-off, within a month, the Company's share price collapsed to $11.40 per share, and within seven months, it was down to $3.06 per share—***an 85% decline***.

C.    <u>**The Company's "Transformation Plan" To Bolster Its Balance Sheet**</u>

46.    Defendants understood that it was critical to reassure the market/investors that it

was solvent and could survive the spin-off, and that its assumed liabilities were limited and under control.

47.     Defendants stated that the "Five Point Transformation Plan" was primarily designed to "transform" the Company's distressed balance sheet.  Defendant Vergnano stated that the "key financial outcome of our transformation plan" was a strengthened, solid balance sheet, which would reduce the Company's "net leverage ratio," a critical financial measure of a company's financial health demonstrating how many years it would take for the Company to pay back its debts (calculated by dividing net debt by adjusted EBITDA).  At the time of the spinoff, the Company's "net leverage ratio" was very high, over 6x debt-to-EBITDA—but Defendants promised that, as a result of the "Five Point Transformation Plan," the Company would "reduc[e] [] [its] net leverage to approximately 3x debt-to-EBTIDA".

48.     However, Defendants were unable to decrease the Company's net leverage ratio if its environmental liabilities outweighed its net assets.  The large accruals required for such liabilities would significantly reduce the Company's earnings and therefore its adjusted EBITDA, which would result in a huge increase in the Company's net leverage ratio.  The only way Defendants could reduce the Company's net leverage ratio was to substantially understate the Company's true liabilities.

49.     In addition to the Five Point Transformation Plan, Defendants reassured the market that the Company's environmental liabilities were under control and would not turn out to be larger than expected.  For instance, on August 6, 2015, on the Company's first earnings call, Defendant Newman stated that the Company's liabilities were "well understood" and "well managed"—and that the Company's own executive team, which consisted of longtime DuPont veterans who formerly ran the Performance Chemicals business (including Defendant Vergnano), had been

personally monitoring the Company's inherited environmental liabilities for a "long time":

> ***Our environmental liabilities are well understood and well managed*** . . . It is important to understand that these [liabilities] are well understood, and the current team has been monitoring these liabilities for many years.

50.     Defendants also reassured the market that the Company's inherited liabilities were under control by disclosing precise potential maximum ranges of losses that could occur in excess of the amounts the Company had accrued.   Defendant Vergnano assured the market of the reliability of these maximum ranges—and of the exceedingly low probability they would ever occur—just after the spin-off.

51.     For instance, in the Company's Form 10-Q for the second quarter ended June 30, 2015, filed on August 6, 2015 (a month after the spin-off), the Company accrued $302 million for environmental remediation and stated that "the potential liability may range up to approximately $650 [million] above the amount accrued."   During the Company's earnings call that same day, analysts asked Defendant Vergnano "what's the probability your crude environmental liability increases by your stated [maximum] risk of $650 million?"   Defendant Vergnano responded that the probability was very low because the liabilities were "very well characterized, very well documented sites" and "we don't see anything that's going to be a surprise."

### D.     Defendants Stated That The Transformation Plan Was A Success

52.     Defendants stated that the Company's Five Point Transformation Plan had "worked" and that the Company initial struggles as an independent company were behind it—and that any possibility of its liabilities being larger than expected was now "deemed remote."

53.     In early 2017, Defendants stated that the Company's "Five Point Transformation Plan" had turned the Company around from insolvency.   During the Company's May 2, 2017 first quarter earnings call, Defendant Vergnano reported that "we've achieved our target net leverage

[ratio] of at or below 3x, a key commitment we made in announcing the transformation plan in August of 2015."  Defendants repeatedly touted to the market that the Company had achieved a "strong balance sheet" and an "improvement in our credit profile" that was so significant it was "recognized in [a] ratings upgrade from Moody's."

54.    Defendants downplayed the significance of the liabilities the Company had inherited from DuPont.  For instance, in the Company's 2016 Form 10-K, Defendants added language, for the first time, that the stated maximum range of liabilities that could occur in excess of the amounts accrued was "deemed remote" by the Company.  Further, Defendants reported "remote" maximum liabilities that were highly limited in nature, which ranged from only $450 million to $535 million.

55.    As a result of Defendants' representations of the Company's "remarkable" transformation, its "strong balance sheet," and its limited liabilities, the Company's stock price increased from approximately $31.94 in February of 2017 to a high of over $58 on October 24, 2017—an increase of 82%.

56.    However, as Defendants would be forced to admit, the Company had not "transformed" itself from being on the brink of its insolvency, nor were its liabilities anywhere near "well managed" at the time of the spinoff – or at any time.  In fact, the Company assumed huge liabilities that Defendants knew were vastly understated—to the point that they had rendered the Company insolvent from "day one."

E.    **According To Verified Complaint, The Company's Liabilities Amounted To $2.5 Billion**

57.    According to the Company's Verified Complaint against DuPont, rather than the Company successfully being "transformed", the opposite was true.  DuPont had saddled the Company with liabilities that were huge (at least $2.5 billion in the aggregate, based on the

Company's own conservative estimate) that they rendered the Company, "insolvent" from the time of the spin-off in violation of Delaware law.

58.     In order to lawfully complete the spinoff under Delaware law, DuPont had to establish that the Company would be solvent as an independent company at the time of its inception.  Thus, the Separation Agreement between the two companies conditioned the spin-off on "the receipt of an opinion from an independent appraisal firm to [DuPont's] Board confirming the solvency of each of DuPont and Chemours" upon the spin-off.

59.     The Company represented that because DuPont was incentivized "to downplay or close its eyes to the true 'maximum' liabilities at the time of the spinoff," DuPont did not conduct the analysis of the liabilities it was transferring to the Company in good faith.  It deliberately "engineered a vastly understated valuation of the liabilities it would impose on Chemours to try to square the spinoff with Delaware law."

### F.     The Company Admits That It Was Insolvent "On Day One"

60.     In the Company's sworn pleading, Defendants admitted that the Company knew the liabilities it inherited from DuPont were so huge that the Company was legally insolvent "on day one."

61.     For instance, the Company reported how Defendant Newman sent an eleventh-hour email to DuPont's senior management that stressed that the Company was significantly under-reserved.  The Company stated that "leading up to a subsequent meeting with DuPont's senior management in June 2015"—only a month before the spinoff would take effect—"Chemours' CFO, Newman, sent an email [to DuPont] pleading that he needed an additional $200-300 million in cash reserves to function on day one."  The $300 million that Defendant Newman requested the Company needed just to function was a material amount, *as it constituted almost 100% of the*

21

*Company's beginning environmental accruals of $316 million*.  However, DuPont refused to increase the Company's reserves and excoriated Defendant Newman for putting his plea in writing. As the Verified Complaint stated DuPont "castigated him [Newman]" for putting the request in an email in an effort to keep the Company's dire financial status hidden from the public.

62.     The very same liabilities that rendered the Company insolvent from its inception did not improve thereafter.  These issues existed throughout the Company's entire history as a public company.

63.     As the Company's sworn Verified Complaint states: "[i]n concocting the 'High End (Maximum) Realistic Exposure' figures, DuPont . . . made no effort to assess or evaluate the *real* maximum potential liabilities" (emphasis in original).  Rather, "it employed an unreasonable process that would predictably understate the liability profile it was creating for Chemours" and as a result, spun off the Company as an insolvent company.  Yet, the Company did nothing to correct this "understate[d] . . . liability profile" for four (4) years, nor did it reveal these massive liabilities or its resulting insolvency to the market.  As set forth herein and as DuPont asserted in its motion to dismiss the Verified Complaint, "Chemours [told] a strikingly different story to the SEC and the investing public [in which] [it] regularly promote[d] itself as a spin-off success."

**G.     The Company Admits That Numerous Categories
Of Liabilities Were Vastly Understated**

64.     In the Verified Complaint, the Company listed several categories of liabilities for which it asserted DuPont had provided phony "maximums" in violation of Delaware law at the time of the spin-off, which resulted in the Company being insolvent as a matter of law from day one.  As set forth below, the Company understated each of these liabilities, accruing nothing at all for certain categories of liabilities for which DuPont had provided specific estimates amounting to hundreds of millions of dollars that the Company actually claimed in its pleading were woefully

deficient.

### 1.    *PFOA Litigation*

65.    The Ohio MDL was brought on behalf of 3,500 individuals with injuries arising from DuPont's discharges of over 1 million pounds of PFOA between 1951 and 2003 from its Washington Works facility in Parkersburg, West Virginia, into the Ohio River.    This contamination resulted in six significant conditions in these individuals, including two types of deadly cancer, that the 2012 Science Panel concluded had "probable links" to PFOA exposure.

66.    In the Verified Complaint, the Company stated that DuPont certified to Houlihan Lokey that the "High End (Maximum) Realistic Exposure" for these 3,500 cases was $128 million, including defense costs.    However, as the Company stated in its Verified Complaint: "[t]his number was a baseless concoction" because "DuPont was paying substantial sums annually on defense costs alone" and "[t]hese were serious cases—hundreds of cancer victims, others with other serious diseases, and DuPont was barred under the settlement agreement from raising a principal defense [causation]."

67.    The Verified Complaint stated that it "became clear that [DuPont's] $128 million maximum would be exceeded—indeed, greatly so."    In late 2015 and 2016, DuPont lost the first three individual trials in the Ohio MDL, forcing it to pay out $20 million.    In February 2017, DuPont and the Company settled the 3,500 cases for $671 million—*i.e.*, "well over five times the [$128 million] 'maximum' that DuPont had certified just 19 months before."    DuPont agreed to foot the bill for half the settlement despite the blanket indemnification provisions of the Separation Agreement, with DuPont and the Company paying out $335 million each.    While DuPont agreed to pay up to $125 million for any additional PFOA litigation, DuPont made clear that this was the extent of its willingness to contribute anything toward the liabilities it had fully assigned to the

Company.  This settlement occurred on or about February 13, 2017, establishing that Defendants knew the full size of the PFOA liabilities it was facing and the extent to which DuPont had understated the certified "maximums" of the liabilities the Company had assumed.

68.     On February 16, 2017, Defendants announced that the Ohio MDL settlement was the full materialization of the Company's PFOA liability exposure, such that it was now a "known" liability.  In March 2017, Defendant Vergnano further stated that the "big overhang" from this liability was "really behind us now."  However, as Defendants knew, the PFOA litigation was far from over.  In his book *Exposure*, Mr. Bilott, the lawyer who spearheaded the prosecution of the Ohio MDL, estimated that the total number of people exposed to PFOA-contamination from Washington Works numbered "approximately 70,000"—yet the MDL resolved only 3,500 of these cases, which were restricted to individuals who: (1) were sickened by one of the six conditions identified by the DuPont-created Science Panel, therefore leaving out those who suffered from severe birth defects or other cancers caused by PFOA exposure; and (2) had been diagnosed with one of the six identified conditions prior to February 11, 2017.

69.     The number of personal injury cases against the Company arising from PFOA exposure increased tenfold from the third quarter of 2017 to the third quarter of 2018, amounting to approximately 60 cases, and continued to increase thereafter.  Most of the cases were consolidated before the same judge as the Ohio MDL, with some cases seeking up to $120 million in damages—and recently, on March 3, 2020, just one of these cases resulted in a $50 million verdict against DuPont and the Company.

70.     Despite these facts, Defendants accrued almost nothing for PFOA litigation.  Aside from accruing $335 million for the settlement of the Ohio MDL in early 2017, the Company never accrued more than $14 to $22 million for all PFOA litigation from approximately mid-February

2017 through August 1, 2019, with portions of even this amount pertaining to the Company's "obligations under agreements with the [EPA]" to test drinking water around Company sites. This *de minimis* accrual amounted to far less than half of the $50 million verdict that was handed down against the Company in just one of the 60 cases mentioned above. In addition, the Company maintained no reserve despite it admitted in the Verified Complaint that it knew that DuPont's $128 million liability estimate, which concerned only a fraction of the potential PFOA claims related to the Washington Works site alone, was a "baseless concoction" that was "spectacularly" understated by over 500%.

71.     Despite the fact that the PFOA liability only increased as events unfolded, beginning in the third quarter of 2018, Defendants claimed in their public filings that any loss in excess of amounts accrued for PFOA litigation would not "have a material impact" on the Company's financials. Even assuming the verdicts in the 60 pending PFOA cases amounted to only $25 million (or half the size of the judgment in just one case), and that no future PFOA cases were filed, the Company would be facing no less than $1.5 billion in liability from these cases alone.

### 2.     New Jersey

72.     In its SEC filings, the Company never accrued more than $101 million for remediation costs across the four highly polluted New Jersey sites it had inherited from DuPont. The Company admitted for the first time in the Verified Complaint that, from the time of the spin-off through 2018, it had received multiple estimates from DuPont quantifying these liabilities at hundreds of millions of dollars higher than the Company's accruals. The Company further admitted that even these much higher estimates from DuPont were "implausib[ly]" low.

73.     The New Jersey sites the Company inherited from DuPont included Chambers

Works and Pompton Lakes Works, two toxic sites that polluted the environment for decades. Chambers Works, located across the Delaware River from the Company's headquarters, produces approximately 1,200 toxic chemicals, including PFOA—and according to recent litigation, has released 107 million pounds of hazardous waste into the surrounding soil, air and drinking water wells.  Pompton Lakes Works is a former munitions facility where DuPont dumped untreated cleaning solutions for decades into a waterway that became known as "Acid Brook"—causing New Jersey Governor Phil Murphy to compare it in 2018 to Love Canal, the notorious site that forced Congress to set up the "Superfund" (a comprehensive federal program designed to clean up the nation's most contaminated sites).

74.     In the Verified Complaint, the Company stated that DuPont provided a "maximum" estimate for the New Jersey environmental liabilities it was transferring to the Company of $337 million, which the Company asserted was clearly a substantial understatement.  Even when DuPont "revised its liability estimate upward to approximately $620 million" in 2018, the Company stated that "it [was] evident (again) that the 'maximum' potential  liability [was] not what DuPont certified it was."  The Company stated that this was demonstrated by New Jersey's response that it was "implausible" that DuPont's $620 million estimate "could represent 'good-faith estimates of [DuPont's historical New Jersey] environmental obligations and liabilities.'"

75.     Despite these facts, the Company accrued a total of only $101 million for remediation across all New Jersey sites during the events in issue—*i.e.*, over $230 million less than the initial $337 million estimate the Company received from DuPont that the Company stated was obviously significantly understated, and over half a billion dollars less than the revised $620 million estimate DuPont provided to Chemours in 2018 that the Company called "implausib[ly]" low.  These understatements of $230 million and over $500 million were highly material,

exceeding the Company's average quarterly net income of $155 million during mid-February 2017 to August 1, 2019, and amounting to 23% and 50%, respectively, of the Company's annual net income of approximately $1 billion.

76.     The $620 million estimate the Company received from DuPont in 2018—which the Company asserted was "implausib[ly] low"—establishes that the accruals and maximum ranges set forth in the Company's SEC filings were materially false and misleading.  For instance, in the Company's 2018 Form 10-K, Defendants accrued a total of $63 million for remediation of the Company's New Jersey sites, and stated that there was a "remote" possibility that the Company might incur losses in excess of the amounts accrued of no more than $450 million for all Company sites nationwide.  Even assuming the $450 million applied only to the Company's New Jersey sites, the $620 million estimate far exceeded the Company's accruals for its New Jersey sites and its "remote" maximum liability by $107 million, or more than 20%.

77.     In line with the Company's assertion that DuPont's much higher $620 million estimate was "implausib[ly]" low, the Company reported in its pleading that it had also been sued by a local New Jersey municipality, Carneys Point, for $1.1 billion—a figure that was based on what it would cost to remediate Chambers Works, just one of the four New Jersey sites the Company inherited from DuPont.  The Company admitted in the Verified Complaint that the Carneys Point lawsuit was so meritorious that it was highly likely to actually incur the $1.1 billion cost.

78.     The Company also stated in the Verified Complaint that its own senior-level employee was complicit in concealing the $1.1 billion cleanup required for Chambers Works from state regulators.  The Company stated DuPont was required to comply with New Jersey's Industrial Site Recovery Act ("ISRA"), which required owners of industrial sites to either remediate

environmental damage prior to a transfer of ownership, or immediately post a bond for the cost of the remediation as computed by a State-approved software program called RACER.  The Company stated in the Verified Complaint that DuPont had violated ISRA by "knowingly conceal[ing] the true nature of the chemicals it discharged" and spinning off Chemours "on the basis of underestimated liabilities."

79.     The Carneys Point lawsuit named as a defendant Sheryl Telford, the former Director of Remediation at DuPont, who took the same position at the Company immediately upon the spin-off.   In its complaint, the township stated that it was Ms. Telford who primarily communicated with NJDEP in connection with Chambers Works and its compliance with ISRA, and it was Ms. Telford who knowingly withheld information from NJDEP—including "that the cleanup of Chambers Works was over $1 billion."  It was not until Carneys Point hired an independent environmental consultant to assess the cost of remediation of Chambers Works under ISRA (using the state-approved RACER program) that it learned of the true $1.1 billion price tag to clean up the site, prompting its lawsuit against the Company.  While the Company asserted in its Verified Complaint that it was DuPont who vastly understated the New Jersey liabilities and concealed the over $1 billion in remediation costs for Chambers Works, in fact, this was done by the Company's own Director of Remediation who was transferred to the Company upon the spin-off.

### 3.     North Carolina

80.     In the Verified Complaint, the Company also stated that its accruals for the remediation of its inherited Fayetteville Works site in North Carolina were significantly understated.  Defendants admitted that they were aware that despite the 2009 EPA Consent Order requiring reduction of GenX emissions at a 99% rate, Fayetteville Works had been dumping GenX

into the Cape Fear River for decades.   As the Company would admit in the Verified Complaint, the actual cost was over eight times this amount, or in excess of $200 million.

81.     Fayetteville Works in North Carolina, which produces GenX—DuPont's PFOA alternative—was transferred to the Company upon the spin-off.  As part of its required TSCA application to the EPA for the use of GenX, DuPont had submitted several studies that indicated that GenX, like PFAS, did not biodegrade in the environment and was associated with increased risk of serious health effects, including cancer and birth defects.  The EPA's 2009 Consent Order accordingly concluded that GenX could be "toxic" to humans and that "uncontrolled . . . disposal of [GenX] may present an unreasonable risk of injury to human health and the environment.  The EPA therefore required DuPont to eliminate 99% of GenX emissions into the environment—an obligation that was inherited by the Company.

82.     In its Verified Complaint, the Company stated that, at the time of the spin-off, DuPont certified a "High End (Maximum) Realistic Exposure" of only $2.09 million for Fayetteville Works.  As the Company stated, this amount was "inexcusably" low because DuPont knew that "the Fayetteville plant had been discharging [GenX] for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people."

83.     In September 2017 and October 2017, the Company asserted that the State of North Carolina and a consolidated putative class of North Carolina residents filed suit against the Company.  In October 2017, DuPont demanded that, pursuant to the Separation Agreement, the Company indemnify it for the entirety of this liability.  As the Company stated in its pleading, it is "indisputable that DuPont's $2.09 million maximum will not suffice against this litigation—not even close."  The Company stated that this was confirmed by a consent order the Company entered into with North Carolina in February 2019 to settle the State's claims. The consent order

"require[d] Chemours to adopt the very-same abatement technology that DuPont previously declined to install and to undertake extensive remediation regarding the cumulative effects of DuPont's long-running historical emissions," which would cost "in excess of $200 million"—or "approximately one hundred times more than DuPont's certified 'maximum' figure for the Fayetteville Works site." The consolidated class action remains pending against the Company— and the Company's motion to dismiss that action was denied.

84.     Defendant Vergnano was the Executive Vice President who directly oversaw the Performance Chemicals division at DuPont for the five years prior to the spin-off, *i.e.*, from October 2009 until July 2015, including Fayetteville Works. Defendant Vergnano was aware of the PFAS emissions caused by Fayetteville Works.

85.     At the September 10, 2019 congressional hearing on PFAS, in response to questions about the Company's knowledge of the extent of the liabilities at Fayetteville Works, Daryl Roberts, DuPont's Chief Operating and Engineering Officer, stated that "[the Company's] CEO [Defendant Vergnano] ran the business line [*i.e.*, Performance Chemicals]" at DuPont, and therefore "made decisions about the business line for many, many years, and their plants made the products we are talking about today." Mr. Roberts stated that it was "very difficult" for the Company to say that it had not known about the true size of the Fayetteville Works liability even before 2015:

> ***What I would say, when we hear the statement that Chemours then later found out [about the size of the Fayetteville Works liability], is that the individuals that were running the sites, the individuals that were developing the products, the individuals that ran this business related to the sites that were fully aware of the financials of the business, fully aware of the liabilities and profits and understood what [Chemours] was taking with it, are the same individuals that sit and run Chemours today . . .*** When the head of the [Performance Chemicals] business is now the CEO [of Chemours], it's clear that there's ownership. And an individual who was part of those discussions, who the scientists work for and is currently running Chemours, it makes it very difficult to say we don't know anything about

it before 2015.

86.     DuPont's representative Mr. Roberts, in his written response to questions for the record following the September 10, 2019 congressional hearing, stated that rather than DuPont, it was Telford—working as the Director of Remediation on behalf of the Company at the time—who engineered the "inexcusable" $2.09 million estimate of remediation costs for Fayetteville Works.  Mr. Roberts stated that "Chemours' own employee"—*i.e.*, Telford, "who was familiar with environmental conditions at the locations that were transferred to Chemours"—"estimated a range between $507,000 and $2.09 million related to contingent environmental liabilities" at Fayetteville Works "for which reserves were established."

87.     Defendants explicitly confirmed their full knowledge that Fayetteville Works had been dumping GenX into the Cape Fear River for nearly four decades.  For instance, on June 7, 2017, the *Wilmington StarNews* published an article on Fayetteville Works, citing scientific studies that had found significant discharges of GenX into the Cape Fear River.  On June 15, 2017, the Company attended a closed-door meeting about the issue with the North Carolina Department of Environmental Quality ("NC DEQ"), in which only one member of the press was allowed to attend.  During the meeting, the Company stated that it (and DuPont's Performance Chemicals division before the spin-off) had known that it had been discharging GenX into the Cape Fear River for decades.

88.     Ms. Kathy O'Keefe, the Company's Product Sustainability Director (who previously worked for DuPont for over 22 years), and Mike Johnson, the Company's Environmental Manager (who had previously worked for DuPont for over 37 years) stated that, despite the EPA Consent Order requiring DuPont and the Company to recover, destroy or recycle 99% of GenX emissions, Fayetteville Works had been dumping GenX into the Cape Fear River

since 1980.  O'Keefe and Johnson claimed that these GenX emissions were permissible under the EPA Consent Order because they were not directly due to the production of GenX, but rather were a "byproduct" from a different manufacturing process.  They asserted that the EPA was never alerted to these discharges because such "byproducts" were "not regulated by any regulatory agency."

89.    This was followed by Mr. Johnson's admissions that DuPont had nonetheless attempted to "abate" these purportedly insignificant GenX discharges in 2013.  Contrary to the Company's Verified Complaint stating that the $2.3 million investment did nothing to end the GenX discharges in the Cape Fear River because it only eliminated one of several waste streams, Mr. Johnson falsely claimed to the NC DEQ that it had resulted in an "80 percent reduction" of the GenX discharges.

90.    Notwithstanding these facts, Defendants maintained no reserve for Fayetteville Works.  Defendants accrued nothing for remediation costs for Fayetteville Works until the fourth quarter of 2018, at which point they accrued a *de minimis* amount of only $10 million.  Even in Defendants' Form 10-Q for the first quarter of 2019, which was filed on May 3, 2019—three months after Defendants entered into the February 2019 consent order with NC DEQ that Defendants knew or were reckless in not knowing would require over $200 million in remediation costs, and only ten (10) days before the Company would file its Verified Complaint reporting these significant costs—Defendants accrued only $25 million, an understatement of 800%.  The remediation cost for Fayetteville Works alone was material, as it equaled approximately 80% of the Company's average remediation accrual of $250 million across all sites during the events in issue, and over 100% of its average quarterly net income of $155 million

91.    Despite referencing in the Verified Complaint that "tort liability" could arise "from

the decades of emissions" at Fayetteville Works, and despite noting that a class action that had proceeded past the motion to dismiss stage was pending against the Company on this very issue, the Company accrued nothing for private litigation arising from the GenX discharges from Fayetteville Works during the Relevant Period.  While Defendants accrued between $43-65 million for litigation costs connected to the site during the time period of mid-February 2017 to August 1, 2019, according to the Company's public filings, all of these accruals related to the dispute with NC DEQ and negotiations of the consent order, not the private litigation. Significantly, in the Eastern District of North Carolina's April 19, 2019 order denying the Company's motion to dismiss, the district court found that the plaintiffs adequately alleged that Defendants had knowingly "***discharge[ed] chemicals into the Cape Fear River even after learning of potential adverse health consequences associated with the chemicals***."

### 4.      Benzene Litigation

92.     In the Verified Complaint, the Company states that it dramatically understated its exposure to benzene liability.  Defendants maintained ***no reserve*** for the Company's benzene litigation and told the market that the liability could not be estimated.  In the Verified Complaint, the Company admitted that DuPont had given it a detailed "comprehensive study" quantifying its inherited benzene litigation as amounting to no less than $111 million, a highly material amount representing over 10% of the Company's annual net income of approximately $1 billion.

93.     The toxicity of benzene has been well known for decades.  According to the Occupational Safety and Health Administration ("OSHA"), the "benzene-leukemia link was first identified in 1897," and in 1948, the American Petroleum Institute stated that "it is generally considered that the only absolutely safe concentration for benzene is zero."  Under the Separation Agreement, the Company inherited 29 benzene-related lawsuits.

94.     In the Verified Complaint, the Company stated that DuPont provided a "High End (Maximum) Realistic Exposure" of $17 million for "all its benzene-related liabilities," including defense costs.  However, the Company noted that in 2017—when DuPont studied the availability of insurance for benzene liability—it "commissioned a more comprehensive study by a consultant" that "valued the potential maximum costs at over $111 million," or "6-7 times higher." DuPont purportedly shared this study with the Company in 2018.

95.     Defendants therefore knew or were reckless in not knowing that based on this "comprehensive study," that its inherited benzene liability was at least $111 million, or 6-7 times higher than DuPont's certified "maximum" of $17 million.  Even before DuPont commissioned the "comprehensive study," Defendants knew or were reckless in not knowing that these liabilities were much more substantial than DuPont's estimated "maximum."  As the Company asserted in the Verified Complaint, when DuPont sold its Performance Coatings business to Carlyle, "DuPont could not get Carlyle to assume the benzene liability, even though Carlyle was purchasing the business that actually generated it."

### 5.     *PFAS and GenX Litigation*

96.     In the Verified Complaint, the Company referenced "rapidly unfolding litigation regarding PFAS," reporting that "although PFOA is one such substance, PFAS involves other substances"—such as GenX—and thus "goes beyond the parties' prior settlement regarding PFOA."  The Company stated that PFAS litigation targeting the Company was "proliferating," and many cases "have been consolidated in a multi-district litigation in federal Court in South Carolina," with additional cases pending in New Jersey and North Carolina.  The Company stated that, at the time of the spin-off, DuPont "did not even purport to conduct an evaluation of PFAS liability (apart from PFOA)" but instead "certified a catch-all 'High End (Maximum) Realistic

Exposure' of $194 million."

97.     The Company, however, accrued nothing for PFAS liability, not even the $194 million certified by DuPont back in 2015 despite admitting in the Verified Complaint that it was already "sadly clear again that the real 'maximum' potential liabilities" far exceeded that amount. Moreover, despite knowing that DuPont did not actually conduct any evaluation of PFAS liability, the Company apparently did not either, instead relying on DuPont's 2015 estimate that the Company itself described as baseless for four years.

6.     **Defendants Admission That Liabilities During Were Over $2.5 Billion**

98.     In the Verified Complaint, Defendants admitted to, and quantified, $2.5 billion in liabilities the Company was saddled with at the time of the spin-off that persisted thereafter, including: (1) the Ohio MDL, for which Defendants' share was $335 million; (2) the "implausib[ly]" low $620 million estimate DuPont provided for liabilities across all four New Jersey sites; (3) the over $1 billion cost for the remediation of Chambers Works, just one New Jersey site; (4) the over $200 million for the remediation of Fayetteville Works; (5) the $111 million for inherited benzene liability; and (6) the $194 million for inherited PFAS liability.

99.     The over $2.5 billion figure was a conservative estimate.  The Company stated that the costs for the New Jersey sites would be "staggeringly expensive," far more than DuPont's $620 million estimate, as evidenced by the $1.1 billion price tag for just one site—in addition to "very substantial additional costs" to cover remediation directives issued by the NJ DEP, as well as hundreds of millions of dollars in overdue fines and penalties.   The Company also admitted that it would likely have to spend in "excess" of $200 million to remediate Fayetteville Works, that the benzene liability would likely exceed DuPont's $111 million estimate, and that DuPont's $194 million estimate for the PFAS litigation was deficient.

100.    Defendants disclosed, on average, $780 million in maximum environmental liability (with over half that amount "deemed remote" by Defendants) during the time period of mid-February 2017 to August 1, 2019—an amount less than one-third of the $2.5 billion in liabilities Defendants would ultimately disclose.  Defendants actually decreased this amount during this time period by over $60 million.

### 7.    A Presentation To The Board Showing Remediation Would Cost $2 Billion

101.    Confirming that the Company's environmental liabilities were severely understated, a confidential witness from the Securities Class Action[2] —the former President of the Fluoroproducts business at the Company from 2016 to October 2019 who reported directly to Defendant Vergnano—stated that she gave an exhaustive presentation in the spring of 2018 to the Defendants Vergnano and Newman (**and then the Company's Board**) showing that remediation across all of the Company's problematic sites would cost $2 billion.

102.    Upon information and belief, in describing how the $2 billion report materialized, the confidential witness in the Securities Class Action stated that the Company's environmental remediation policy in general was to do only the bare minimum. The Company would observe mandatory limits set by state and federal governments, but whenever there were gaps in regulation, the Company would not voluntarily spend money on remediation—the policy was "don't ask, don't tell."  Upon information and belief, the confidential witness stated that her predecessor, Thierry Vanlancker (President of the Fluoroproducts business at DuPont and then Chemours), was not in favor of taking preemptive action to protect the environment.  Mr. Vanlancker used to shrug and tell colleagues: "Why be more Catholic than the Pope?"

---

[2]    *In re The Chemours Company Sec. Litig.*, C.A. NO. 1:19-CV-01911-CFC (D. Del.) (hereinafter, the "Securities Class Action").

103.    However, upon information and belief, the confidential witness stated that when the $671 million settlement of the Ohio MDL occurred in February 2017, the Company had a "moment of enlightenment," *i.e.*, it realized that by performing the bare minimum it had exposed itself to significant liabilities. As a result, upon information and belief, the confidential witness conducted an exhaustive evaluation of total environmental remediation costs that would be required to clean up problematic sites Company-wide.   Upon information and belief, this culminated in the confidential witness presenting a detailed report directly to Defendants Vergnano and Newman (***and then the Company's Board***) stating that the Company's current environmental remediation costs would be $2 billion.

104.    Upon information and belief, in early 2018, the confidential witness began an exercise of looking into how much it would cost to "plug all the holes" at each Company worksite and remediate the damage already done to the environment. Upon information and belief, the confidential witness prepared a detailed report summing up the remediation liabilities—which she calculated would cost approximately $2 billion—over the course of three months in the spring of 2018, ***which the confidential witness planned to present at the upcoming board meeting in August 2018***.

105.    Upon information and belief, the confidential witness stated that, by this time—the spring of 2018—Defendants Vergnano and Newman were fully aware of the very high $2 billion expenditure she planned to recommend to the Company's Board.   Upon information and belief, the confidential witness stated that she had direct conversations with Defendants Vergnano and Newman, as well as the Company's General Counsel Dave Shelton, about the $2 billion figure while she was preparing the report—***as they would have to review the report before it was presented to the Company's Board***—which occurred during monthly executive staff meetings that

Vergnano, Newman and Shelton attended, in addition to "Vergnano's staff," which included E. Bryan Snell (President of Titanium Technologies), Erich Parker (SVP of Corporate Communications), Susan Kelliher (SVP of HR), and Ed Sparks (the individual who took over the confidential witness's job when she left the Company). Upon information and belief, the confidential witness also stated that these conversations would be reflected in the meeting minutes.

106.    Upon information and belief, the confidential witness further stated that Defendant Vergnano was not surprised by the $2 billion figure—by now, Defendant Vergnano was resigned to the fact that the Company was going to have to spend millions of dollars on remediation every year for at least the next ten years.

107.    Notwithstanding the confidential witness's report, the Company reduced both its reserves and its maximum liability range in 2018. Although internally aware that remediation costs would approach at least $2 billion, Defendants hid these numbers by publicly disclosing a second set of numbers which vastly understated the Company's expected environmental remediation costs. Defendants accrued an average of $240 million for environmental remediation in 2018—which, in light of the confidential witness's report stating that remediation Company-wide would cost at least $2 billion, was a massive understatement of approximately $1.8 billion. Moreover, Defendants actually decreased their environmental remediation accruals as 2018 progressed. In the first quarter of 2018, Defendants accrued $254 million for environmental remediation, while they accrued only $226 million in the fourth quarter—a reduction of more than 10%. The Company reduced its "remote" maximum exposure from $510 million to $450 million—a reduction of almost 12%.

108.    At the same time, Defendants were downplaying the Company's exposure to environmental liabilities, Defendants Vergnano and Newman capitalized on their knowledge of

the Company's true liabilities by conducting insider sales of the Company stock that were highly suspicious in both timing and magnitude.  Shortly after the confidential witness provided her comprehensive analysis that estimated approximately $2 billion in remediation liabilities, Defendants Vergnano and Newman sold $10.1 million and $2.2 million worth of the Company stock, respectively, over the course of just two days on May 8 and 9, 2018.  Moreover, these sales were effectuated at prices of up to $50.86 per share—representing near-term highs for the Company stock price—and before Defendants' fraud was revealed through several corrective disclosures, which caused the Company stock price to drop as low as $14.96 by approximately August 1, 2019.

109.    Upon information and belief, the confidential witness further expressed that the Company's decision to file the Delaware Chancery Complaint against DuPont was very much the "nuclear option" for Defendant Vergnano.

## V.    THE TRUTH EMERGES

### A.    <u>The Company's Liabilities Are Exposed At The Sohn Investment Conference</u>

110.    On May 6, 2019, the Sohn Investment Conference was held in New York City. During the conference, Larry Robbins, the CEO and Portfolio Manager of Glenview Capital Management gave a presentation during which he revealed previously undisclosed information about the true liabilities that the Company and other chemical manufacturers were facing as a result of increasing PFAS litigation exposure.

111.    In his presentation, Mr. Robbins stated that the Company had significantly understated the environmental liabilities it was facing, highlighting that the Company, DuPont and other manufacturers of PFAS had known about the contamination of drinking water supplies— and the deadly human health effects that such contamination caused—for decades, but

intentionally suppressed that information from the public.  Mr. Robbins also underscored the fact that the Company was forced to indemnify DuPont for these liabilities: "the liabilities are now Chemours'.  Every time you see DuPont losing a suit, you should assume that that liability will stay with Chemours."  As a result of his analyses, Robbins stated that the Company faced "$4 to 6 billion" in environmental liabilities—a huge amount that represented "60 to 100% of its market [capitalization]."

112.    On this news, the Company's stock price dropped over two trading days from $34.18 per share on Friday, May 3, 2019 to $29.09 per share on Tuesday, May 7, 2019—a decline of nearly 15% that wiped out over $830 million in the Company's market capitalization.

113.    In the days that followed, Defendants strongly disputed Robbins' conclusions and sought to reassure the market regarding the Company's environmental litigation liabilities."

### B.    The Verified Complaint Exposes That The Company Was Insolvent At The Time Of The Spin-Off

114.    The Verified Complaint contained a series of admissions by the Company, including that the Company actually faced environmental liabilities of approximately $2.5 billion, and this figure was conservative.  The Company had sought to keep the Verified Complaint sealed, as it originally filed the complaint under seal on May 13, 2019.

115.    The Verified Complaint included admissions that the Company was insolvent from its inception, with liabilities far outstripping its assets.  For example, the Verified Complaint admitted that the environmental liabilities that the Company assumed through the spin-off were so huge that the Company had been set up to fail from the beginning and was legally insolvent as a matter of "Delaware General Corporation Law, common law and public policy."  The Verified Complaint detailed how the "maximum" liability estimates that were used by DuPont to support the spin-off under Delaware law were "routine and radical understatements" and "systematically

40

and spectacularly wrong," to the point that the "entire spin-off process was a sham."

116.    The Verified Complaint addressed four specific categories of liabilities that established the Company's insolvency: (1) PFOA-related litigation; (2) North Carolina environmental liabilities; (3) New Jersey environmental liabilities; and (4) Benzene and PFAS litigation liabilities. The Verified Complaint described the "staggering" liabilities facing the Company for each category of liability, detailed how DuPont's initial estimates for each category were "baseless" and "miniscule," and how even the upwardly-revised estimates were "implausible" and "not good-faith estimates." For example, the Verified Complaint specifically identified "over $1 billion" in remediation and litigation liabilities for just one New Jersey site, "more than $200 million" of remediation costs in North Carolina, "over $111 million" in benzene litigation liabilities, and in excess of "$194 million" in PFAS litigation liabilities.

117.    The Company's Verified Complaint admitted it was insolvent from the moment the spin-off was consummated, and that it had only kept its head above water by materially misleading investors about the true size of its liabilities.

118.    In response to these disclosures, the Company's stock price fell nearly 15%, from $24.90 per share on June 27, 2019 to $21.17 per share on July 2, 2019, wiping out over $610 million in market capitalization.

119.    In a statement released to reporters following the unsealing of the Verified Complaint, the Company stated:

> "Chemours believes the legal action we have taken in Delaware Chancery Court is in the best interest of all Chemours stakeholders.  From its inception, Chemours moved quickly and with urgency to transform the company and take action to address historic issues.  The language in the lawsuits speaks for itself and we will not comment further on pending litigation."

120.    Despite the Company's assurance that the Verified Complaint was "in the best

interest of all Chemours stakeholders," analysts were shocked by Defendants' admission that the Company had significantly understated the magnitude of its liabilities by no less than $2.5 billion.

      **C.**      **Defendants Reluctantly Reveal The**
                     **Effects Of The Company's Actual Liabilities**

121.    On August 1, 2019, the Company reported its second quarter results and suddenly lowered its full-year guidance, indicating that, rather than a "strong," "solid, or "flexible" balance sheet with ample room to deal with future liabilities, the Company had virtually no liquidity. When the Company filed its Form 10-Q the same day, the Company further disclosed huge increases in its estimated environmental liabilities, including over a dozen new legal and regulatory actions related to PFAS.

122.    On this news, the Company's shares dropped from $18.16 per share on August 1, 2019 to $14.69 on August 2, 2019—a 19% decline that wiped out another $560 million in market capitalization.

123.    On January 10, 2020, the House of Representatives passed H.R. 535, the PFAS Action Act, which required the EPA to designate PFOA and PFOS chemicals as hazardous substances under the Superfund law, and directed the EPA to create limits for PFOA and PFOS in drinking water within two (2) years. In a press release issued the same day, the House highlighted that the act "stem[s] the tide of further contamination with tough new testing, reporting and monitoring requirements; strict[ly] limits [] the introduction of new PFAS chemicals; [puts] limits on air emission and ban[s] unsafe incineration; [and implements] strong measures to hold contaminating companies accountable."

124.    PFAS-related federal investigations and the potential for future such investigations have continued. On February 14, 2020, the Company filed its Annual Report on Form 10-K with the SEC. The 2019 Form 10-K disclosed that, in January 2020, the Department of Justice ("DOJ")

and United States Attorney's Office for the Eastern District of Pennsylvania informed the Company that they were considering initiating a criminal investigation of the Company under the Federal Food, Drug and Cosmetic Act concerning PFAS exposure. The 2019 Form 10-K declined to estimate a range of possible losses stemming therefrom.

125.     The 2019 Form 10-K also reported that, on January 14, 2020, the Michigan Attorney General had joined other states in filing PFAS-related litigation against the Company.

126.     On February 20, 2020, the EPA announced that, pursuant to its PFAS Action Plan of February 2019, it would set legal limits for PFAS in drinking water nationwide. The EPA also updated the Action Plan to state that it "has multiple criminal investigations underway concerning PFAS-related pollution."

127.     The fallout from Defendants' fraud has been devastating for the Company and will continue to be for years to come.

## VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     False Statements In 2017

128.     On February 16, 2017, the Company held its year-end and fourth quarter 2016 investor conference call. During the call, Defendants announced annual adjusted EBITDA of $822 million and net income of $7 million, which Defendant Vergnano attributed to "truly a year of transformation guided by our Five-Point Transformation Plan," and reported that "Chemours exited 2016 in a very strong position" with the "effects of our transformation plan [] evident in our earnings results."

129.     Defendants also reported the $671 million settlement of the Ohio MDL related to PFOA emissions, which the Company announced three days beforehand. Defendant Vergnano described the Ohio MDL settlement as largely resolving the Company's PFOA-related liabilities:

"I would say . . . after this period as we get through the finality of the settlement we should have our [PFOA] costs come down."  Defendant Vergnano also reported that the Company had made "great progress on reducing our net leverage" to 3.3x, "a tremendous reduction since spin," and as a result, "[w]e have sufficient balance sheet capacity to fund both our portion of [the Ohio MDL settlement] and to support the planned expansions in 2017 and beyond."

130.    Defendant Newman also reported that "[w]e've always said we expect our environmental to be a fairly steady, mature liability.  Now that we have clarity around PFOA, I think from a credit perspective our view is we are in a better position today with that as a known, certainly for the next five years."

131.    The quoted statements in paragraphs 115-117 above were materially false and misleading.  Rather than PFOA-related litigation and remediation being a "fairly steady, mature liability," such that it was now a "known" and as the Company admitted in the Verified Complaint, this category of inherited liability—which was uncapped with no end in sight—had only deepened the Company's "insolvency" that began from the time of the spin-off.  Therefore, the Company had not exited 2016 in a "very strong position," nor did it have "sufficient balance sheet capacity" to fund the $335 million settlement in addition to other expenditures.  To the contrary, and as Defendants stated in the Verified Complaint, this settlement amount was much larger than what the Company had planned for.  The only way Defendants had made "great progress on reducing [the Company's] net leverage" was not through its "Five-Year Transformation Plan," but by concealing and understating the Company's over $2.5 billion in liabilities revealed in the Verified Complaint.  Further, far from PFOA costs "com[ing] down" in the future, the exact opposite was true.  The Ohio MDL settled only narrow categories of PFOA litigation, resolving just 3,500 out of 70,000 potential claims arising from the Washington Works facility.  PFOA litigation left

unresolved by the Ohio MDL increased tenfold from mid-February 2017 to August 1, 2019, with just one out of over 60 pending cases resulting in a $50 million verdict against DuPont and the Company.

132.     On February 17, 2017, Defendants filed the Company's 2016 Annual Report on Form 10-K (the "2016 Form 10-K").  Defendants reported a total environmental remediation accrual of just $278 million, which they asserted was "appropriate based on existing facts and circumstances," and further stated that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $535 million above the [$278 million] amount accrued at December 31, 2016."   The 2016 Form 10-K also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

133.     The statements referenced in paragraph 119 above were materially false and misleading.  As Defendants have now admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were massive, amounting to over $2.46 billion, such that they rendered the Company insolvent as a matter of law from the time of the spin-off.

134.     Defendants' assertion that their reserve of only $278 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $813 million) bore no relation to reality.

135.     Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also false.  In the

Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-february 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  In addition, the Company asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA.  Further, Defendants knew from the time of the spin-off that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which Defendants knew was the minimum cost to stop future PFAS discharges at Fayetteville Works, in addition to substantial clean-up costs for the decades of emissions that Defendants knew had already occurred.

136.    Defendants also misrepresented the Company's substantial liability for benzene-related litigation. The Form 10-K did not accrue any amounts for benzene-related litigation liability and reported that while a loss was possible "a range of such losses cannot be reasonably estimated at this time."

137.    The statements referenced above that the Company's benzene liabilities "cannot be reasonably estimated" were materially false and misleading.  The Company's Verified Complaint admitted that a 2017 "comprehensive study" of its inherited benzene liability specifically quantified it as amounting to no less than $111 million—an estimate that the Company labeled as a reliable, "real number."  In addition, the Company admitted that at the time of filing its 2016 Form 10-K, Defendants were in possession of another much lower $17 million estimate of the benzene liabilities from DuPont that Defendants knew was "spectacularly" understated and demonstrated DuPont's "bad faith" in conducting the spin-off.  Defendants stated in their Verified

Complaint that it was clear that the benzene liability was far more significant, as shown by the fact that DuPont was unable to unload it on Carlyle, which purchased the related Performance Coatings business.

138.    On March 27, 2017, Defendant Vergnano was interviewed by financial reporters during a live television broadcast of Bloomberg Television's Wall Street Week, during which he assured the market that the Company's inherited environmental liabilities were "behind us."  The first question noted that following the Company's post spin-off stock price decline, "[t]here is quite a bit of bearishness . . . on the company" and asked Defendant Vergnano "[w]hat did investors and analysts get wrong?"  Defendant Vergnano replied that as a spin-off of DuPont, the Company inherited a number of great products and businesses "but we also had some liabilities we had to deal with.  Heavy level of debt, we had some legal liabilities, and that now has gone behind us. We've de-levered the company, ***those legal liabilities are behind us***, and now people are starting to see the businesses we have turned out."  Later in the interview, Defendant Vergnano was asked about whether the settlement of the Ohio PFOA MDL addressing 3,500 lawsuits removed the "overhang" of PFOA-related lawsuits "or are we going to see more cases come forward?" Defendant Vergnano replied: "I think that was the big issue that a lot of investors had, that one set of cases . . . .  So I think that those 3,500 cases were the big cloud, the big overhang that are really behind us now."

139.    On March 27, 2017, Defendant Vergnano was interviewed by financial reporters during a live broadcast of CNBC's Power Lunch.  During the interview, Defendant Vergnano asserted that the Company had "executed every element of [its transformation] plan," and as a result, "we're just about three times levered and we're where we want to be."  Defendant Vergnano was also asked whether, given the Company's "global joint settlement with DuPont in terms of the

PFOA issue," "are all the legal liabilities behind you at this point in terms of the money that you need to set aside or potential future litigation?"  In response, Defendant Vergnano confirmed that "I think that our transformation plan and the settlement that we worked out with DuPont really put those behind us."

140.    The statements above were materially false and misleading.  Defendants confirmed, in direct contrast to Defendant Vergnano's repeated statements, that the Company's environmental liabilities were not "behind us," and that the Company's transformation plan had not put the Company "where we want to be" at "three times levered."  To the contrary, Defendants admitted in the Verified Complaint that the Company's environmental remediation and litigation liabilities amount to over $2.46 billion, a huge amount that rendered the Company insolvent as a matter of law from the time of the spin-off.  Defendants had achieved their goal of being "three times levered" not by "execut[ing] every element of [its transformation] plan," but by concealing and understating these massive liabilities.  Defendants' assertions that the Company's "legal liabilities are behind us," and the "big [PFOA] overhang" was "behind us now," were false for the additional reason that, as Defendants knew, the Ohio MDL settlement resolved a fraction of the Company's massive environmental liabilities.  Further, the Company's "settlement" with DuPont only covered 3,500 out of a potential 70,000 PFOA cases arising from the Ohio MDL.  In fact, additional PFOA litigation increased thereafter.

141.    On May 2, 2017, Defendants reported the Company's first quarter earnings for 2017, including adjusted EBITDA of $285 million and net income of $150 million.  Defendant Vergnano reported that the Company's "transformation plan has made a huge impact on our business," as the Company had "achieved our target net leverage of at or below 3x, a key commitment we made in announcing the transformation plan in August of 2015."

142.    Defendant Newman stated that the Company had "reached [its] goal of reducing [its] net leverage ratio to be at or below 3x on a trailing 12-month basis" to 2.7x, and "[w]e are proud of the progress we've made to reduce our net leverage, which you may recall was north of 6x at spin."   Defendant Newman also stated that the Company had achieved "balance sheet flexibility."

143.    On May 3, 2017, Defendants filed with the SEC the Company's Form 10-Q for Q1 2017.   Defendants reported a total environmental remediation accrual of just $279 million that they asserted was "appropriate under existing facts and circumstances," and stated that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $480 [million] above the [$279 million] amount accrued."   The Form 10-Q also reported that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

144.    The statements above were materially false and misleading.  The Company had not "reached [its] goal" of reducing its net leverage ratio to below 3x because of its "transformation plan," nor had it achieved "balance sheet flexibility."   As Defendants have now admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so huge, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law from the time of the spin-off.  Thus, Defendants' net leverage ratio only increased after the spin-off—the only way Defendants were able to purportedly claim they had reduced it was by concealing and vastly understating these massive liabilities. Defendants' assertion that their reserve of only $279 million was "appropriate based on existing

facts and circumstances" was also false.

145.    Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was false.   In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.   Further, the Company stated that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA.   In addition, Defendants knew from the time of the spin-off that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which Defendants knew was the minimum cost to stop future PFAS discharges at Fayetteville Works, in addition to substantial clean-up costs for the decades of emissions that Defendants knew had already occurred.

146.    The Form 10-Q also stated that "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading for the reasons explained above.

147.    Defendants also made a series of false and misleading statements designed to convince the market that certain of their more significant environmental liabilities were supposedly inconsequential. For instance, on June 15, 2017, the *Wilmington StarNews* reported on a study finding that the Company's Fayetteville Works plant had been releasing PFAS into the Cape Fear River for many years, and that the chemicals had contaminated the region's drinking water.   The article detailed a meeting that the Company held with local and state officials on June 15, 2017, in

which the Company staff stated that the process that was causing the contamination had been part of Fayetteville Works' operations since 1980.  However, Ms. Kathy O'Keefe, the Company's Product Sustainability Director (who previously worked for DuPont for over 22 years), made multiple statements emphasizing that the contamination posed absolutely no harm to human health:

> Our belief is that the GenX level in the drinking water coming from the Cape Fear River is safe and it does not pose any harm to human health.  We have that belief; we're confident in that belief:

148.    Further, Ms. O'Keefe compared the trace amounts of GenX emitted by Fayetteville Works to the benign amounts of "formaldehyde" released "[w]hen you cook Brussel sprouts."  At the same meeting, Mr. Michael Johnson, the Company's Environmental Manager, who had previously worked at DuPont for over 37 years, reported that the amount of GenX in the Cape Fear River "is very, very small.  When you look at parts per trillion, you're looking at very, very small concentrations," also reporting that "it's not like there's a cup or a swimming pool." Mr. Johnson further stated that abatement technology DuPont had installed in 2013 had resulted in an "80 percent reduction" of any trace amounts of GenX that were present in the river.

149.    On June 20, 2017, the Company issued a press release reporting that it would be undertaking remediation activities at the Fayetteville Works site to address alleged contamination in the Cape Fear River caused by years of GenX emissions.  The Company, however, assured the market that Fayetteville Works emissions had not impacted the safety of drinking water:

> Wilmington, Del., June 20, 2017 – The Chemours Company (Chemours) (NYSE: CC) today announced that it will capture, remove, and safely dispose of wastewater that contains the byproduct GenX generated from fluoromonomers production at its manufacturing plant in Fayetteville, North Carolina. Trace GenX amounts in the Cape Fear River to date have been well below the health screening level announced by the North Carolina Department of Health and Human Services on June 12, 2017, and the company continues to believe that emissions from its Fayetteville facility have not impacted the safety of drinking water.  However, Chemours will take these

additional steps, embracing its role as a significant employer and member of the community.  The capture and removal of this wastewater will commence on June 21, 2017.  This action complements the abatement technology already put in place at the Fayetteville site in 2013.

150.    The statements above were materially false and misleading.   Contrary to Defendants' claim that GenX "is safe and does not pose any harm to human health," the Company was in possession of numerous studies showing that GenX was "toxic" and presented serious danger to human health—including a risk of cancer and birth defects—and had significantly contaminated drinking water sourced from the Cape Fear River.  Defendants admitted in the Verified Complaint that because of the significant harms caused by Fayetteville Works' decades of PFAS emissions into the Cape Fear River, the Company faced significant liability—including "tort liability"—that rendered it insolvent from the time of the spin-off.  Defendants further admitted in the Verified Complaint that the abatement technology DuPont installed in 2013—which Johnson claimed had resulted in an "80 percent reduction"—had done nothing to stop GenX emissions, as it had eliminated only one of numerous waste streams going into the river.

151.    On August 3, 2017, Defendants held their earnings call announcing their results for the second quarter of 2017.  Defendant Newman stated that there were "year-over-year increases across all key financial metrics" and "significant improvement in profitability," which Defendant Vergnano attributed to "the success of our transformation plan."

152.    Defendant Newman also stated that the Company had further reduced its net leverage ratio to 2.2x on a trailing 12-month basis, "well below our net leverage target of 3x, including our new debt issuance, [which] demonstrates our significantly improved credit profile."

153.    The same day, Defendants filed with the SEC the Company's Form 10-Q for Q2 2017.  Defendants reported a total environmental remediation accrual of just $278 million that Defendants state was "appropriate based on existing facts and circumstances" and further stated

that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $480 [million] above the [$278 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows at any given year, as such obligation can be satisfied or settled over many years."

154.    The statements above were materially false and misleading. The Company had not achieved a "significant improvement in profitability" as a result of the "success" of its transformation plan, nor had it "significantly improved [the Company's] credit profile" through a reduction in net leverage. As Defendants have admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off. The Company's "profitability" and "significantly improved credit profile" were in fact attributable to Defendants' deliberate concealment and vast understatement of these massive liabilities. Defendants' assertion that their reserve of only $278 million was "appropriate based on existing facts and circumstances" was also false.

155.    Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also false. In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-february 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. In addition, Defendants asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited

New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA.  Defendants also knew from the time of the spin-off that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which Defendants knew was the minimum cost to stop future PFAS discharges at Fayetteville Works, in addition to substantial clean-up costs for the decades of emissions that Defendants knew had already occurred.

156.    The Form 10-Q also repeated the statement: "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and Defendants refused to report any amount of liability for the benzene liabilities.

157.    On November 3, 2017, the Company held its earnings call for the third quarter of 2017.  Defendant Vergnano reported that the Company "had another great quarter" and that "[t]he significant progress we've made over the last couple of years to improve our cash generation and strengthen our balance sheet now affords us greater financial and strategic flexibility."

158.    Defendant Newman also reported that the Company had further reduced its net leverage ratio to 2x on a trailing 12-month basis and that "[w]e're very pleased with the continued improvement in our credit profile as recently recognized in the ratings upgrade from Moody's."  During the question and answer session, Defendant Newman again touted the Company's reduction in net leverage, reporting "[w]e had committed to be at 3x in '17" and "[t]oday, we're at 2x . . . obviously, [we] continue to have as a key focus a strong balance sheet.  It was recently recognized with the Moody's upgrade."

159.    On that same day, the Company filed its Form 10-Q with the SEC for the third quarter of 2017.  Defendants reported a total environmental remediation accrual of just $268 million and stated that "under adverse changes in circumstances, although deemed remote, the

potential liability may range up to approximately $510 [million] above the [$268 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations or cash flows in any given year, as such obligation can be satisfied or settled over many years."

160. The statements above were materially false and misleading. The Company had not achieved "improved profitability," nor did it have "continued improvement in [its] credit profile" or a "strong balance sheet" as evidenced by the Moody's upgrade. The exact opposite was true. As Defendants admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off. Defendants' purportedly "strong balance sheet" had only resulted from their concealment and vast understatement of these massive liabilities—as evidenced by the fact that, when the truth of the Company's financial condition was revealed, Moody's immediately downgraded the Company from "stable" to "negative," stating that "[t]he negative outlook reflects the growing litigation risk and possible future costs associated with PFAS water contamination." Defendants' assertion that their reserve of only $268 million was "appropriate based on existing facts and circumstances" was false.

161. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was false. In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of

the Company's annual net income.  The Company also asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA.  Additionally, according to the confidential witness in the Securities Class Action, beginning in June 2017, the Company's senior management, including Defendant Newman, attended weekly "crisis" meetings regarding the escalating situation at Fayetteville Works, and in September 2017, the State of North Carolina filed a lawsuit against the Company to enjoin the Company from discharging "all GenX compounds into the Cape Fear River" and "[r]emove, treat or control" all such discharges in order to continue operations at Fayetteville Works—remediation Defendants admitted in the Verified Complaint would cost in excess of $200 million.

162.    The Form 10-Q also repeated the statements "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement and omission were false and misleading.

163.    On December 1, 2017, the Company held an "Investor Day" conference to discuss the Company's financial performance. Defendants Newman, Vergnano, and certain other Company representatives participated in the conference on behalf of the Company.  During the call, Defendant Newman touted that "[i]n less than 2.5 years, we have been able to de-lever our balance sheet, reducing our net leverage ratio from north of 6x to approximately 2x today, well below what we contemplated at spin and much faster too."  Defendant Newman also stated that "[t]his improvement has been recognized by our rating agencies with the recent Moody's and S&P upgrades," resulting in a "strong BB credit profile." Defendant Vergnano further stated that the Company's transformation plan was "complete and Chemours has been transformed":

Our transformation plan powered tremendous financial improvement in both our earnings and on our balance sheet.  We made some bold commitments, and we delivered on those.  Today, we can officially declare that our plan is complete and Chemours has been transformed. In fact, this afternoon, we'll ring the New York Stock Exchange Closing Bell to symbolically mark this achievement for ourselves, our investors and our customers.

164.  In response to a question from Christopher Perrella, a securities analyst at *Bloomberg*, asking "[h]ow . . . should I think about the cash spend for environmental issues over the next couple of years," Defendant Newman stated that "[w]e had quite a bit of spend this year related to the Pompton Lake.  And we expect that spend to gradually decline over time, while of course, the reserve will continue to come down as it has since been. So I wouldn't expect any significant change in cash spending."

165.  The statements above were materially false and misleading.  Defendants had not successfully "transformed" the Company such that they had "de-lever[ed]" or "powered tremendous financial improvement" in its balance sheet, nor had the Company achieved a "strong credit profile" as evidenced by the Moody's upgrade.  Rather, as Defendants have admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it legally insolvent at the time of the spin-off.  The Company's purportedly "strong credit profile" had only resulted from Defendants' concealment and vast understatement of these massive liabilities—as evidenced by the fact that, when the truth of the Company's financial condition was revealed, Moody's immediately downgraded the Company from "stable" to "negative," stating that "[t]he negative outlook reflects the growing litigation risk and possible future costs associated with PFAS water contamination."  Further, as Defendants admitted in the Verified Complaint, their environmental liabilities were not expected to "come down" or "gradually decline over time"—indeed, the opposite was true.  Defendants expected their expenditures on environmental

liabilities to only increase, threatening the Company's viability.

**B.     False Statements In 2018**

166.     On February 15, 2018, the Company held its fourth quarter and full year earnings call.  Defendant Vergnano stated that "2017 proved to be the year that we solidified our foundation, as we successfully completed our Five-Point Transformation Plan" which "helped us to achieve the impressive financial results that we just reviewed."

167.     Defendant Newman also stated that "2017 proved to be a great finale to our transformation plan," as the Company had "maturely improved our profitability." Defendant Newman further stated that the Company had reduced its net leverage ratio to 1.8x, "over a full turn less than our original leverage target of 3x," resulting in "strong balance sheet flexibility" that "really supports the objectives that we've laid out for shareholders."

168.     On February 16, 2018, the Company filed its 2017 Form 10-K with the SEC. Defendants reported a total environmental remediation accrual of just $253 million, which was actually a significant reduction of close to 10% from the $278 million accrual the Company reported just one year earlier, in its 2016 Form 10-K.  With respect to that reduced accrual, Defendants reported that it was "appropriate based on existing facts and circumstances," and also reported that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 million above the [$253 million] amount accrued." The 2017 Form 10-K also reported that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows at any given year, as such obligation can be satisfied or settled over many years."

169.     The statements above were materially false and misleading.  Defendants had not

"successfully" transformed the Company or "maturely improved [its] profitability" through the "successful[] completion" of its transformation plan, nor had the Company achieved "strong balance sheet flexibility." As Defendants admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law from the time of the spin-off. In light of these facts, Defendants' assertion that their reserve of only $253 million was "appropriate based on existing facts and circumstances" was false.

170. Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also false. In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income. Further, Defendants asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Defendants also admitted in the Verified Complaint, regulatory scrutiny of the Fayetteville Works site increased significantly throughout 2017, including of the effects of the PFAS emissions on public health, indicating that substantial remediation costs—which Defendants would admit in the Verified Complaint exceeded $200 million—were imminent.

171. The 2017 Form 10-K repeated the statements above that "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities. This statement was false and misleading. In addition, the Company

admitted in its Verified Complaint that by no later than 2018, DuPont had provided the Company with the "comprehensive study" precisely estimating the benzene liabilities "at over $111 million."

172. On May 4, 2018, Defendants held their earnings call for the first quarter of 2018. Defendant Vergnano reported that the Company had achieved "meaningful improvements across all key financial metrics," and that its "net income and EPS doubled . . . driven by the strength of our business."

173. Defendant Newman also claimed that the Company now had a "solid balance sheet position," reporting that "the strength of our balance sheet" had provided the Company "ample flexibility, which we put to good use during the quarter."

174. On the same day, the Company filed with the SEC the Company's Form 10-Q for Q1 2018. Defendants reported a total environmental remediation accrual of just $254 million that Defendants stated was "appropriate based on existing facts and circumstances," and stated that "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $510 million above the [$254 million] amount accrued." The Form 10-Q also reported that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years."

175. The statements above were materially false and misleading. The Company had not achieved a "solid," "strong" or "flexible" balance sheet that was "driven by the strength of our business." The opposite was true. Defendants admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of

law at the time of the spin-off.  The Company's "solid" and "strong" balance sheet had only resulted from Defendants' concealment and vast understatement of these massive liabilities. Defendants' assertion that their reserve of only $254 million was "appropriate based on existing facts and circumstances" was clearly false.

176.    Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also false.  In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Further, Defendants asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA.  Defendants also admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future PFAS emissions.  In addition, in early 2018, the confidential witness in the Securities Class Action, the former President of the Fluoroproducts business at the Company who reported to Defendant Vergnano, stated that she directly provided Defendants with a comprehensive environmental remediation liability analysis by no later than the spring of 2018 that calculated the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

177.    The Form 10-Q also repeated the statements above that "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement and omission were false and misleading.  In addition,

the Company admitted in its Verified Complaint that by no later than 2018, DuPont had provided the Company with the "comprehensive[3] study" estimating the benzene liabilities "at over $111 million."

178.    Defendants engaged in suspiciously timed insider trading only days after filing the 10-Q.  Defendants Vergnano and Newman each sold unusually large amounts of Company stock, precisely at a time when they could maximize their insider profits.  Defendants Vergnano and Newman sold over $10.1 million and $6.8 million in Company stock, respectively, in the time period from mid-February 2017 to August 1, 2019, after having sold zero shares before mid-February 2017.

179.    These sales were coordinated, as the overwhelming majority of the sales occurred between May 8 and 9, 2018.  On these two days, Defendant Vergnano sold over $10.1 million worth of Company stock, while Defendant Newman sold $2.2 million worth.  These May 2018 sales were timed to maximize insider profits, as they were made shortly after Defendants had received the Securities Class Action confidential witness's internal estimate of approximately $2 billion in Company liabilities for remediation.  The sales were strategically timed at prices of up to $50.86 per share, at near-term highs for Company stock price, and before several disastrous corrective disclosures sank the Company's stock price as low as $14.96.

180.    On August 3, 2018, Defendants held their second quarter earnings call for 2018. During the call, Defendant Newman reported that "we continue to enhance our liquidity while adding flexibility to [the Company's] balance sheet," and that the Company "continued to benefit

---

[3]    Defendants entered into 10b5-1 trading plans on March 2 and March 15, 2018, which provided or allowed for the highly suspicious—and for Defendant Vergnano, truly anomalous—stock sales just weeks later, on May 8-9, 2018.  After the trading plans served their purpose of "allowing" Defendants' massive stock dumping in May 2018, Defendants abandoned the trading plans. Moreover, Defendant Newman's other stock sales from mid-February 2017 to August 1, 2019 were not pursuant to any trading plan.

from the flexibility that our balance sheet provides."

181.    On the same day, Defendants filed with the SEC the Company's Form 10-Q for Q2 2018.  Defendants reported a total environmental remediation accrual of just $247 million, which Defendants stated was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $500 [million] above the [$247 million] amount accrued."  The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on the Company's financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years."

182.    The statements above were materially false and misleading.  Defendants had not "add[ed] flexibility" to the Company's balance sheet.  Defendants admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off.  In light of these facts, Defendants' assertion that their reserve of only $247 million was "appropriate based on existing facts and circumstances" was false.

183.    Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also false.  In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Further, Defendants asserted that DuPont's $620 million

estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA.  Defendants had also directly received an upward estimate of "maximum" liability from DuPont of remediation across all New Jersey sites of $620 million, which Defendants asserted in the Verified Complaint was "implausib[ly]" low. Defendants further admitted in the Verified Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million, which was the minimum required amount to end future PFAS emissions (in addition to the substantial costs required to clean up the decades of emissions that had already occurred).   Further, in early 2018, the confidential witness in the Securities Class Action, the former President of the Fluoroproducts business at the Company who reported to Defendant Vergnano, stated that she directly provided Defendants with a comprehensive environmental remediation liability analysis by no later than the spring of 2018 that calculated the Company faced no less than $2 billion in existing remediation costs across all Company sites (excluding any related litigation).

184.    The Form 10-Q also repeated the statements that "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refused to report any amount of liability for the benzene liabilities. This statement and omission were false and misleading.

185.    On November 2, 2018, Defendants held their earnings call for the third quarter of 2018.  Defendant Newman touted the "profitability of our business," and stated that the Company had reduced its net leverage ratio again, to 1.5x.  Defendant Newman also stated that "[w]e continue to believe that our balance sheet affords us ample strategic flexibility in each of our 3 businesses and the ability to manage through any broader economic cycle."

186.    On November 2, 2018, Defendants filed with the SEC the Company's Form 10-Q

for Q3 2018.  Defendants reported a total environmental remediation accrual of just $239 million, which Defendants stated was "appropriate based on existing facts and circumstances," and further reported that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $470 million above the [$239 million] amount accrued." The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows in any given year, as such obligation can be satisfied or settled over many years."

187.    The statements above were materially false and misleading.  The Company had not achieved "profitability," nor did it have "ample strategic flexibility" on its balance sheet.  The exact opposite was true.  Defendants admitted in the Verified Complaint, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off.   Defendants' assertion that their reserve of only $239 million was "appropriate based on existing facts and circumstances" was false.

188.    Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false.  In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Further, Defendants asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount

that was required to be posted immediately under ISRA.  Defendants also admitted in the Verified

Complaint that remediation costs for Fayetteville Works alone would greatly exceed $60 million,

which was the minimum required amount to end future PFAS emissions.  In addition, in early

2018, the confidential witness in the Securities Class Action, the former President of the

Fluoroproducts business at the Company who reported to Defendant Vergnano, stated that she

directly provided Defendants with a comprehensive environmental remediation liability analysis

by no later than the spring of 2018 that calculated the Company faced no less than $2 billion in

existing remediation costs across all Company sites (excluding any related litigation).

189.    The November 2, 2018 Form 10-Q also reported a total litigation accrual for PFOA

of only $20 million, with no accrual at all for PFAS litigation, and stated that "while management

believes it is reasonably possible that Chemours could incur losses in excess of the amounts

accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify

DuPont], it does not believe any such loss would have a material impact on the Company's

consolidated financial position, results of operations, or cash flows."

190.    The statements above were materially false and misleading.  This was the first time

since mid-February 2017 that Defendants had expressly claimed in their public filings that PFOA

and PFAS litigation would have no "material impact" on the Company's financials—however, the

exact opposite was true.  PFOA litigation had only increased, amounting to 60 cases that were filed

by the end of 2018 claiming up to $120 million in personal injury damages.  Considering that just

one of these actions resulted in a $50 million verdict against the Company, this litigation clearly

posed a material threat to the Company. Moreover, as Defendants admitted in the Verified

Complaint, PFAS litigation was also quickly "proliferating" across the country during this time,

including by civil litigants and governmental authorities.  DuPont had given the Company a precise

estimate for this liability of $194 million at the time of the spinoff, which was itself highly material (equaling the Company's average net quarterly income during the time period from mid-February 2017 to August 1, 2019), that the Company admitted in the Verified Complaint vastly understated the PFAS liability risk it actually faced.

191.    The Form 10-Q also repeated the statements that "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement and omission were false and misleading.

**C.      <u>False Statements In 2019</u>**

192.    On February 15, 2019, Defendants held their earnings call for the fourth quarter and full year 2018.  During the call, Defendant Vergnano touted "[t]he strength of our balance sheet," which "affords us the ability to invest in our company while continuing to return significant cash to shareholders through our share repurchase authorization and dividends."

193.    Defendant Newman stated that the Company's net leverage ratio continued to be low at approximately 1.6x, and asserted that "[w]e believe that our de-risked balance sheet gives us the ability to execute our strategy through any potential economic cycle, while returning the majority of our free cash flow to shareholders."

194.    On February 15, 2019, Defendants filed with the SEC the Company's 2018 Form 10-K for 2018.  Notwithstanding the fact that the Company was just three short months from filing its lawsuit against DuPont in which it disclosed for the first time that it faced billions of dollars in environmental liabilities that rendered it insolvent, in its 2018 Form 10-K, the Company reported both reduced accruals and purported "maximum liability" figures.  In that filing, the Company reported accruals for environmental remediation of only $226 million, a reduction of more than 10% from the $253 million it had accrued in its 2017 Form 10-K, and a reduction of almost 20%

from the accrual set forth in its 2016 Form 10-K.  The Company also stated that its "remote" maximum liability above that accrual would only be $450 million—a reduction of almost 12% from the $510 million the Company reported in the 2017 Form 10-K.  The Form 10-Q also again stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows at  any given year, as such obligation can be satisfied or settled over many years."

195.    The statements above were materially false and misleading.  The Company's balance sheet was not "strong" or "de-risked."  Defendants admitted in the Verified Complaint, the Company environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off.  Defendants' assertion that their reserve of only $226 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $676 million) bore no relation to reality.

196.    Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was false.  In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Further, the Company itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that

was required to be posted immediately under ISRA.  In addition, Defendants admitted in the

Verified Complaint, Defendants had entered or were about to enter into the consent order with NC

DEQ requiring them to spend in excess of $200 million to remediate Fayetteville Works.  In

addition, in early 2018, the confidential witness in the Securities Class Action, the former President

of the Fluoroproducts business at the Company who reported directly to Defendant Vergnano, had

directly provided a comprehensive environmental remediation liability analysis that calculated that

the Company faced no less than $2 billion in existing remediation costs across all Company sites

(excluding any related litigation).

197.    The 2018 Form 10-K also reported a litigation accrual for PFOA of just $22 million,

with no litigation accrual at all for other types of PFAS, and stated that, "while management

believes it is reasonably possible that Chemours could incur losses in excess of the amounts

accrued, if any, for the [proceedings regarding which the Company was obligated to indemnify

DuPont], it does not believe any such loss would have a material impact on Chemours'

consolidated financial position, results of operations, or cash flows."

198.    The statements above that the Company's PFOA and PFAS litigation would have

no "material impact" on the Company's financials were materially false and misleading.  PFOA

litigation had only increased, amounting to 60 cases that were filed by the end of 2018 claiming

up to $120 million in personal injury damages.  Considering that just one of these actions resulted

in a $50 million verdict against the Company, this litigation clearly posed a material threat to the

Company.  In addition, as Defendants admitted in the Verified Complaint, PFAS litigation was

also quickly "proliferating" across the country during this time.  DuPont had given the Company

a precise estimate for this liability of $194 million at the time of the spinoff, which was itself highly

material (equaling the Company's average net quarterly income during the time period of mid-

February 2017 to August 1, 2019), that the Company admitted in the Verified Complaint vastly understated the PFAS liability risk it actually faced.

199.    The 2018 Form 10-K repeated the statements that "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement was false and misleading.

200.    The 2018 Form 10-K further stated, with respect to GenX, that "[t]he Company believes that discharges to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina."  This statement was false and misleading.

201.    On May 3, 2019—ten days before Defendants would file the Verified Complaint in the Delaware Chancery Court—Defendants held their first quarter earnings call for 2019. Defendant Newman stated that "[w]ith a strong balance sheet heading into 2019, we were able to opportunistically execute on our share repurchase program, fund the working capital needs of the business and execute strategic investments."

202.    On May 3, 2019, Defendants filed with the SEC the Company's Form 10-Q for Q1 2019.  Defendants reported a total environmental remediation accrual of just $233 million, which Defendants stated was "appropriate based on existing facts and circumstances," and further stated that, "under adverse changes in circumstances, although deemed remote, the potential liability may range up to approximately $450 million above the [$233 million] amount accrued."  The Form 10-Q also stated that "[m]anagement does not believe that any loss, in excess of amounts accrued, related to remediation activities at any individual site will have a material impact on our financial position, results of operations, or cash flows for any given year, as such obligation can be satisfied or settled over many years."

203.    The statements above were materially false and misleading.  The Company did not have a "strong balance sheet heading into 2019."  Defendants admitted in the Verified Complaint ten days later, the Company's environmental remediation and litigation liabilities were so massive, amounting to over $2.46 billion, that they far outweighed the Company's net assets and rendered it insolvent as a matter of law at the time of the spin-off and thereafter.  Defendants' assertion that their reserve of only $233 million was "appropriate based on existing facts and circumstances" was false, and their quantification of maximum environmental liability "up to" a certain amount (here, "up to" $683 million) bore no relation to reality.

204.    Defendants' statement rejecting the notion of any "material impact" on the Company from remediation activities with respect to "any individual site" was also demonstrably false.  In the Verified Complaint, Defendants admitted that they were told by DuPont prior to mid-February 2017 that remediation costs for the Company's New Jersey sites alone would be $337 million, and thereafter, $620 million—highly material amounts that constituted 34% and 62%, respectively, of the Company's annual net income.  Further, the Company itself asserted that DuPont's $620 million estimate was "implausi[bly]" low, and that the true remediation liability for just one of the inherited New Jersey sites, Chambers Works, would be as much as $1.1 billion—an amount that was required to be posted immediately under ISRA. Defendants also admitted in the Verified Complaint, Defendants had entered or were about to enter into the consent order with NC DEQ requiring them to spend in excess of $200 million to remediate Fayetteville Works.  In addition, in early 2018, the confidential witness in the Securities Class Action, the former President of the Fluoroproducts business at Chemours who reported directly to Defendant Vergnano, had directly provided a comprehensive environmental remediation liability analysis that calculated that the Company faced no less than $2 billion in existing remediation costs across all Company sites

(excluding any related litigation).

205.   The Form 10-Q also reported a litigation accrual for PFOA of just $22 million, with no litigation accrual at all for PFAS, and stated that, "while management believes it is reasonably possible that Chemours could incur losses in excess of the amounts accrued, if any, for the [proceedings regarding which Chemours was obligated to indemnify DuPont], it does not believe any such loss would have a material impact on the Company's consolidated financial position, results of operations, or cash flows."

206.   The statements above that the Company's PFOA and PFAS litigation would have no "material impact" on the Company's financials were materially false and misleading.  PFOA litigation had only increased, amounting to 60 cases that were filed by the end of 2018 claiming up to $120 million in personal injury damages.  Considering that just one of these actions resulted in a $50 million verdict against the Company, this litigation clearly posed a material threat to the Company.  Further, Defendants admitted in the Verified Complaint, PFAS litigation was also quickly "proliferating" across the country during this time.  DuPont had given the Company a precise estimate for this liability of $194 million at the time of the spin-off, which was itself highly material, that the Company admitted in the Verified Complaint vastly understated the PFAS liability risk it actually faced.

207.   The Form 10-Q also repeated the statements that "a range of . . . losses [for benzene litigation] cannot be reasonably estimated" and refusing to report any amount of liability for the benzene liabilities.  This statement and omission were false and misleading.

208.   The Form 10-Q repeated the statement above stating, with respect to GenX, that "[t]he Company believes that discharges to the Cape Fear River, site surface water, groundwater, and air emissions have not impacted the safety of drinking water in North Carolina."  This

statement was false and misleading.

209.    Defendants also misrepresented the Company's liability for several lawsuits filed by the NJ DEP in March 2019. The Form 10-Q did not report any accruals for liabilities relating to these actions, and stated that while a loss was possible, it was "not estimable." This statement was false and misleading. Rather than losses from these actions being "not estimable," as Defendants admitted in the Verified Complaint, the Company was aware of estimates by DuPont that its environmental liabilities in New Jersey would be approximately $620 million, a figure Defendants admitted was, as New Jersey had stated, "implausib[ly]" low. Furthermore, Defendants admitted in its Verified Complaint that New Jersey's lawsuits threatened the Company with "staggeringly expensive" costs well into the "hundreds of millions of dollars."

210.    Then, less than two months before the 10-Q was filed, Defendant Newman engaged in further suspicious sales on March 11, 2019. On that date—at near-term price peaks and shortly before the Company filed its Verified Complaint against DuPont on May 13, 2019, Defendant Newman sold more shares, for more proceeds, than at any other time up until that point.

211.    Finally, each of Chemours' Forms 10-K and 10-Q filed from mid-February through August 1, 2019 represented that the Company's financial statements were "prepared in accordance" with GAAP, and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Vergnano and Newman. The SOX Certifications assured investors that the subject Form 10-K or 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." The SOX Certifications also stated that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows,"

of Chemours. Furthermore, the SOX Certifications stated that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

### D. The Company's Financial Statements Violated GAAP

212.    In addition, for the reasons set forth above, the Company's Financial Statements Violated Generally Accepted Accounting Principles ("GAAP"). Compliance with GAAP is a fundamental obligation of publicly traded companies.  GAAP are the principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time. The SEC requires the financial statements of public companies, such as the Company, to adhere to GAAP.[4]  SEC Regulation S-X, to which the Company is also subject, provides that annual and interim financial statements, including all notes to the statements, "filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." *See* 17 C.F.R. § 210.4-01(a)(1) and § 210.10-01(a) (regarding annual and interim financial statements, respectively).

## VII.    DUTIES OF THE DIRECTOR DEFENDANTS

213.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

---

[4]    The SEC recognizes the financial reporting and accounting standards of the Financial Accounting Standards Board ("FASB") as "generally accepted" for purposes of federal securities laws.  *See* SEC Release Nos. 33-8221, 34-47743, and FR-70.

214.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

215.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and,

75

upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

      (e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

      (f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

216.    Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

217.    Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## VIII.  THE COMPANY'S REPURCHASE OF COMPANY STOCK AT INFLATED PRICES

### A.    2017 Share Repurchase Program

218.    On November 30, 2017, the Board approved a share repurchase plan authorizing the purchase of shares of the Company's issued and outstanding common stock in an aggregate amount not to exceed $500 million, plus any associated fees or costs in connection with the Company's share repurchase activity (the "2017 Share Repurchase Program").  On May 31, 2018, the Company completed the aggregate $500 million in authorized purchases of the Company issued and outstanding common stock under the 2017 Share Repurchase Program, which amounted to a cumulative 10,085,647 shares purchased at an average share price of $49.58 per share.

**B.      2018 Share Repurchase Program**

219.    On August 1, 2018, the Board approved a share repurchase program authorizing the purchase of shares of Company issued and outstanding common stock in an aggregate amount not to exceed $750 million, plus any associated fees or costs in connection with the Company share repurchase activity (the "2018 Share Repurchase Program").   The Company's 2018 Share Repurchase Program became effective on August 1, 2018, was announced to the public on August 2, 2018, and will continue through the earlier of its expiration on December 31, 2020, or the completion of repurchases up to the approved amount.

220.    During 2018, the Company purchased 6,350,857 shares of the Company issued and outstanding common stock under the 2018 Share Repurchase Program, which amounted to $250 million at an average share price of $39.31 per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

221.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

222.    Plaintiff will adequately and fairly represent the interests of the Company in

enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

223.    Plaintiff is a current owner of the Company stock and has continuously been an owners of Company stock during the times relevant to Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

224.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

225.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

226.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

227.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

228.    Each of the Director Defendants authorized and/or permitted the false statements

to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

229.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Vergnano**

230.    The principal professional occupation of Defendant Vergnano is his employment with the Company as its President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Additionally, Defendant Vergnano is a named defendant in the securities class action entitled *In Re The Chemours Company Securities Litigation*, Civil Action No.: 19-cv-1911 (the "Securities Class Action").

**Defendants Vergnano, Anastasio, Bell, Brown, Cranston, Crawford, Farrell, and Keohane**

231.    For the reasons stated below, demand is excused against Defendants Vergnano, Anastasio, Bell, Brown, Cranston, Crawford, Farrell, and Keohane.

232.    A confidential witness from the Securities Class Action—the former President of the Fluoroproducts business at the Company from 2016 to October 2019 who reported directly to Defendant Vergnano—stated that she gave an exhaustive presentation in the spring of 2018 to the Defendants Vergnano and Newman (***and then the Company's Board***) showing that remediation across all of the Company's problematic sites would cost $2 billion.

233.    Upon information and belief, the confidential witness stated that when the $671 million settlement of the Ohio MDL occurred in February 2017, the Company had a "moment of

enlightenment," *i.e.*, it realized that by doing the bare minimum it had exposed itself to significant liabilities. As a result, upon information and belief, the confidential witness conducted an exhaustive evaluation of total environmental remediation costs (not taking into account potential related litigation) that would be required to clean up problematic sites Company-wide.  Upon information and belief, this culminated in confidential witness presenting a detailed report directly to Defendants Vergnano and Newman (**and then the Company's Board**) stating that the Company's current environmental remediation costs would be $2 billion.

234.    Upon information and belief, in early 2018, the confidential witness began an exercise of looking into how much it would cost to "plug all the holes" at each Company worksite and remediate the damage already done to the environment.  Upon information and belief, the confidential witness prepared a detailed report tallying the remediation liabilities—which she calculated would cost approximately $2 billion—over the course of three months in the spring of 2018, **which the confidential witness planned to present at the upcoming board meeting in August 2018**.

235.    Upon information and belief, the confidential witness stated that, by this time—the spring of 2018—Defendants Vergnano and Newman were fully aware of the very high $2 billion expenditure she planned to recommend to the Company's Board.  Upon information and belief, the confidential witness stated that she had direct conversations with Defendants Vergnano and Newman, as well as the Company's General Counsel Dave Shelton, about the $2 billion figure while she was preparing the report—as they would have to review the report before it was presented to the Company's Board—which occurred during monthly executive staff meetings that Vergnano, Newman and Shelton attended, in addition to "Vergnano's staff," which included E. Bryan Snell (President of Titanium Technologies), Erich Parker (SVP of Corporate

Communications), Susan Kelliher (SVP of HR), and Ed Sparks (the individual who took over the confidential witness's job when she left the Company).   Upon information and belief, ***the confidential witness also stated that these conversations would be reflected in the meeting minutes***.

236.    Upon information and belief, the confidential witness further stated that Defendant Vergnano was not surprised by the $2 billion figure—by now, Defendant Vergnano was resigned to the fact that the Company was going to have to spend millions of dollars on remediation every year for at least the next ten years.

237.    Notwithstanding the confidential witness's report, the Company reduced both its reserves and its maximum liability range in 2018.  Although internally aware that remediation costs would approach at least $2 billion, Defendants hid these numbers by publicly disclosing a second set of numbers which vastly understated the Company's expected environmental remediation costs.  Defendants accrued an average of $240 million for environmental remediation in 2018—which, in light of the confidential witness's report stating that remediation Company-wide would cost at least $2 billion, was a massive understatement of approximately $1.8 billion. Moreover, Defendants actually decreased their environmental remediation accruals as 2018 progressed. Indeed, in the first quarter of 2018, Defendants accrued $254 million for environmental remediation, while they accrued only $226 million in the fourth quarter—a reduction of more than 10%.  The Company reduced its "remote" maximum exposure from $510 million to $450 million—a reduction of almost 12%.

238.    Defendants Vergnano, Anastasio, Bell, Brown, Cranston, Crawford, Farrell, and Keohane breached their fiduciary duties of due care, loyalty, and good faith, because they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and

other disclosures when they knew that the Company's environmental liabilities were in the billions of dollars and not what they were presently reporting to the market/investors.   Therefore, Defendants Vergnano, Anastasio, Bell, Brown, Cranston, Crawford, Farrell, and Keohane face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Bell, Anastasio, Cranston, Crawford and Kane**

239.   The Audit Committee Defendants (Bell, Anastasio, Cranston, Crawford and Kane) each face a substantial likelihood of liability for their failure to take steps to ensure the Company's regulatory compliance. The Audit Committee Charter specifically charges the members of the Audit Committee with ensuring the Company's compliance with legal and regulatory requirements, and the Audit Committee Defendants violated their duties of loyalty and good faith by failing to take adequate steps to ensure such compliance.

**Defendants Vergnano, Newman, Brown, Anatasio,**
**Bell, Cranston, Crawford, Farrell and Keohane**

240.   Defendants Vergnano, Newman, Brown, Anatasio, Bell, Cranston, Crawford and Farrell signed the false and misleading 2016 Form 10-K and 2017 Form 10-K, which falsely represented that the Company environmental liabilities.  Defendants Vergnano, Newman, Brown, Anatasio, Bell, Cranston, Crawford Farrell and Keohane signed the false and misleading 2018 10-K.

241.   Confirming that the Company's environmental liabilities were grossly understated during the Relevant Period, the confidential witness in the Securities Class Action—the former President of the Fluoroproducts business at the Company from 2016 to October 2019 who reported directly to Defendant Vergnano—stated that she gave an exhaustive presentation in the spring of 2018 to Defendants Vergnano and Newman (***and then the Company's Board***) showing that

remediation across all of the Company's problematic sites would cost $2 billion.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

242.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

243.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

244.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

245.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

246.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

247.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost

of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

248.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

249.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the relevant period.  It resulted in continuous, connected, and ongoing harm to the Company.

250.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

251.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

252.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### (Against Defendants For Unjust Enrichment)

253.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

255.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from

Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendant due to his wrongful conduct and breach of their fiduciary duties.

256.    Further, Defendants Vergnano and Newman sold $10.1 million and $2.2 million worth of Company stock, respectively, over the course of just two days on May 8 and 9, 2018—after having sold zero shares prior to the relevant period.  Moreover, these sales were effectuated at prices of up to $50.86 per share—representing near-term highs for the Company's stock price—and before Defendants' fraud was revealed through several disastrous corrective disclosures, which caused the Company's stock price to plummet as low as $14.96.

## COUNT IV

### (Against Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

257.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

258.    During the Relevant Period, Defendants disseminated or approved public statements that failed to disclose that the Company's environmental liabilities were vastly greater than reported and, as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of Defendants.  Despite this artificial inflation in the price of the Company's shares, Defendants caused and/or allowed the Company to repurchase shares of Company stock, thereby causing financial harm to the Company.

259.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to

the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

260.   Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the relevant period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Director Defendants, which includes the Audit Committee Defendants.

261.   At a minimum, Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at the Company, Defendants knew and/or recklessly disregarded the extent and scope of their statements during the relevant period.

262.   Likewise, Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  Defendants had the ultimate authority over and were

involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

263.    As such Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

264.    As a result of Defendants' misconduct, the Company is also suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT V**

**(Derivative Claim for Violations of Section 20(a) of the Exchange Act
Against Defendant Vergnano)**

265.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

266.    This Count is asserted on behalf of the Company against Defendant Vergnano for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

267.    During his tenure as President and CEO and a member of the Board, Defendant Vergnano was a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of his control, Defendant Vergnano had the power and authority to direct the management and activities of the other Company officers, to hire and fire

the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein.  Defendant Vergnano was able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the relevant period, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

268.    In his capacity as President and CEO, and a member of the Board, Defendant Vergnano had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendant Vergnano agreed with their course of conduct.

269.    As a result of the foregoing, Defendant Vergnano, individually, was a controlling person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

270.    As a direct and proximate result of Defendant Vergnano's conduct, the Company suffered damages in connection with its purchase of the Company common stock at materially inflated prices.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for

amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.       Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.       Granting such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 24, 2020

**O'KELLY & ERNST, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (#4788)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*